COLUMBUS, The (SANDERSON v.). See Case No. 12,299.

COLUMBUS (UNITED STATES v.). See Case No. 14,841.

COLUMBUS, C. & I. C. RY. CO. (PITTSBURG. C. & ST. L. RY. CO. v.). See Case No. 11,197.

COLUMBUS, The CHRISTOPHER. See Cases Nos. 2,705 and 2,706.

COLUMBUS, ETC., R. CO. (DIXON v.). See Case No. 3,929.

# Case No. 3,045.

COLUMBUS INS. CO. v. CURTENIUS et al.

[6 McLean, 209.] [1]

Circuit Court, D. Illinois.    Oct. Term, 1853.

OBSTRUCTION TO NAVIGATION BY STATE AUTHORITY—INJURY TO VESSEL—PLEADING.

1. The whole legislation from the ordinance of 1787 to the present time, clearly indicates that congress has intended that the Mississippi and its navigable tributaries should remain free from all material obstruction to their navigation.
[Cited in Hatch v. Wallamet Iron Bridge Co., 6 Fed. 333; Huse v. Glover, 15 Fed. 297.]

2. A state cannot authorize any material obstruction to be placed in the channel of a navigable tributary of the Mississippi.

3. The declaration alleged that the defendants had placed piers in the principal channel of the river Illinois, so as essentially to obstruct its navigation, and that in consequence of such obstruction a loss was sustained. The defendants pleaded that in placing the piers there they had complied with an act of the legislature of Illinois, authorizing a bridge to be constructed. Held, that the plea was not a good defense to the action, but that it must go further, and deny that the bridge was a material obstruction to the navigation of the river.
[Cited in Missouri River Packet Co. v. Hannibal & St. J. R. Co., 2 Fed. 290.]

At law.

Lincoln & Chumasero, for plaintiffs.
Logan & Powell, for defendants.

DRUMMOND, District Judge.    This is an action brought by the plaintiffs as insurers of a canal-boat and cargo of wheat, which

[1] [Reported by Hon. John McLean, Circuit Justice.]

were lost by the canal-boat's striking the piers of the bridge built by the defendants, near Peoria, while on the passage from Peru to St. Louis, and which loss the plaintiffs have been obliged to pay. The canal-boat was towed by the steamer Falcon at the time of the loss, 19th March, 1849. The declaration alleges that the defendants placed piers in the principal channel of the Illinois river, a navigable river free to all the citizens of the United States, so as essentially to obstruct the navigation of the same, and that in consequence of such obstruction the loss above mentioned occurred. There are different counts, varying the form of the statement, but this is the substance in each. There are several pleas put in by the defendants which rely upon the following defense. That by an act of the legislature of Illinois, of 26th January, 1847, they were authorized to erect the bridge, and place as many piers in the bed of the river as might be necessary for the support and construction of the bridge, provided a space of at least seventy-five feet from pier to pier, and embracing the principal channel of the river be left and always kept open for the passage of all craft navigating the river, and they aver that the demands of the law have been complied with, and particularly that they have in the precise language of the above proviso, left and kept open the proper space, embracing the principal channel, for the passage of all craft navigating the river. A demurrer has been interposed to these pleas, and the question for the court to determine is, whether the matters stated in the pleas constitute a defense to the action. In other words, had the state of Illinois the power to authorize the construction of such a bridge? This is the only question which has been argued.

The allegation by the plaintiffs is, that the piers which have been placed in the principal channel of the river by the defendants, essentially obstruct its navigation. The only way in which this is met by the defendants, is by the statement that they have kept open a space of seventy-five feet, embracing the principal channel, for the passage of all craft navigating the river. If, therefore, under the law as it stands and the pleadings in this case, the defendants should establish that they had left a space of seventy-five feet, embracing the principal channel, for the passage of river craft, that would be a complete defense to the action, though it might be true that the piers were so placed as to constitute an essential obstruction to the navigation of the river, and by reason thereof the plaintiffs suffered the damage complained of. And as a necessary deduction from this we must admit that if the legislature should declare that a certain space left in a navigable river was sufficient for the free navigation of the same, that declaration would be binding and conclusive on all the world. And,

in fact, that is the ground assumed on the argument by the defendants' counsel, and they have even gone further, if this indeed is going further, and insisted that the state had the right totally to obstruct the navigation of the river. It will be seen, therefore, that the question, as it is now presented, is not whether Illinois had the power to authorize the construction of a bridge across a navigable stream, provided it did not essentially impede the navigation of the river; neither is it, whether this particular bridge, built by the defendants, is an essential obstruction, because that is a question of fact to be determined by evidence; but whether the court will presume that it is not an obstruction, because the defendants have left open a passage of seventy-five feet, in opposition to the assertion placed upon the record that it is.

The first point to be determined is, whether the river Illinois, over which this bridge has been erected, is in law a navigable river free to all citizens. The tide does not ebb and flow there, and technically, according to the common law, it is not navigable, though it is so in fact. But, even if it is considered navigable, and if in this respect it stands upon the same footing as rivers where the tide ebbs and flows, it does not follow that the power of the state is not plenary over it, because, as we shall see hereafter, the states have in some instances totally obstructed navigable streams. The question is, is it navigable and is it free? By the ordinance for the government of the territory northwest of the river Ohio. of 1787, it was provided (article 4) that the navigable waters leading into the Mississippi and St. Lawrence should be common highways, and forever free to all the citizens of the United States. It is said that this provision of the ordinance is not in force. This seems to be the doctrine now established by the supreme court of the United States, contrary to what has been the general understanding for many years, in the states carved out of that territory. Permoli v. First Municipality, 3 How. [44 U. S.] 589; Pollard v. Hagan, 3 How. [44 U. S.] 212; Strader v. Graham, 10 How. [51 U. S.] 82. It was never doubted but that any provisions of the ordinance which were contrary to the constitution of the United States, and the laws passed in pursuance thereof, or to the constitutions of the states formed out of that territory were abrogated, because the "common consent" mentioned in the ordinance was then presumed. But it seems certain that congress did not exactly regard the ordinance as at an end, by the adoption of the constitution of the United States, as is plain from the very first law on the subject adapting it to the constitution (1 Stat. 50). And in allowing the various states which were formed out of that territory to adopt state governments, provision was made that they should not do anything repugnant to the ordinance,

with certain specified exceptions. As to Ohio, act of April 30, 1802, § 5 (2 Stat. 173). As to Indiana, act of April 19, 1816, § 4 (3 Stat. 289). As to Illinois, act of April 18, 1818, § 4 (3 Stat. 428). And the same is true of the states since admitted, Michigan and Wisconsin. And congress extended the provisions of this ordinance, except the introductory clause, over some of the southwestern states. But without dwelling upon this part of the subject, which is only mentioned for the purpose of showing how fully this ordinance was followed up by congress, let us see how the question stands upon acts of congress passed from time to time since the organization of the government. The government started with the declaration that the navigable waters leading into the Mississippi should be common highways and forever free. It is said by the court in the case of Strader v. Graham, already referred to, that the new government (constitution and laws of the United States) secured to the people of the northwestern states all the public rights of navigation and commerce which the ordinance did or could provide for. It would be a curious commentary upon this language to say that the western states can materially obstruct or dam up the great navigable rivers within their borders. But the legislation of congress seems to warrant the opinion expressed by the court. Besides the acts already referred to, many others may be mentioned as indicating the views of congress as to western rivers. In the act providing for the sale of lands northwest of the Ohio and above the mouth of the Kentucky, of May 18, 1796 (1 Stat. 464), the ninth section declares that all navigable rivers within the territory to be disposed of by that act, shall be deemed to be and remain public highways. And so in relation to the rivers within certain boundaries, by the sixth section of the act of June 1, 1796 (1 Stat. 491). The same provision was applied to all the rivers of the Indiana territory, north of the Ohio and east of the Mississippi, of which Illinois then formed a part, by the sixth section of the act of March 26, 1804 (2 Stat. 277). The seventeenth section of the act of March 3, 1803 (2 Stat. 235), made the same rule applicable to all navigable rivers within the territory of the United States south of the state of Tennessee. And so, as to the navigable waters in Louisiana. Act Feb. 20, 1811, § 3. And it was an express condition of her admission into the Union, that the Mississippi and the navigable waters leading into the same should be forever free. Act April 8, 1812 (2 Stat. 642, 703). The same rule was applied to the rivers of Alabama (Act March 2, 1819); and to Mississippi (Act March 1, 1817; 3 Stat. 492, 349); and to Missouri (Act June 4, 1812, § 15; 2 Stat. 747). Indeed, without proceeding further, it may be safely affirmed that in no instance has congress permitted an occasion to pass without declaring that the Mississippi and its navigable tributaries shall remain public highways and forever free. These various enactments clearly prove the extraordinary solicitude with which congress has from the very foundation of the government watched over this subject. It would seem impossible to misapprehend the motive of such legislation. But it is said, that the new states having come into the Union upon an equal footing with the original states, these various laws in relation to the navigable rivers are not binding on the new states, unless as regulations of commerce, and that, being contained in land laws, most of them are mere territorial regulations, and temporary in their character. Now, it is immaterial whether congress has legislated under the impression that a part of the ordinance of 1787 was still in force, although it is not; provided it is apparent from its whole tenor of legislation that it has re-enacted such part and given it continued operation. And that does seem to be the fact in this instance. If we find a law of congress, and more especially if we find a series of laws all tending to the same result, the main question is not, whether congress was looking to this or that part of the constitution for the power to enact, but is the power in the instrument? If it is, it is a binding, valid law, no matter what part of the constitution congress was thinking of at the time of its passage. It has sometimes happened that congress has passed laws as they supposed under one part of the constitution, and the supreme court has given them effect under another. I think, therefore, that congress has intended, and carried that intent into effect, to make the Mississippi, and the navigable waters leading into it from this state, common public highways and free to all the citizens of the United States. To hold otherwise would be in effect to decide that Illinois and Missouri, or Illinois and Iowa would have the right to shut up the Mississippi river anywhere above a port of entry, if indeed it may be considered thus qualified. For though it has been thought that there is some magic power about a port of entry, it will be found, on examination, that the distinction which is sometimes taken between navigable waters above and below a port of entry, is rather fanciful than real.

If, then, congress has legislated rightfully on this subject, the next thing to be considered is, how far that legislation has restricted the power of the states. Do the navigable rivers declared free by congress stand upon the same footing, and not otherwise, as rivers where the tide ebbs and flows? If there is no difference, then the subject is by no means free from difficulty, because the states have in some instances partially, and in others, totally, obstructed rivers navigable at common law. In Massachusetts, the doctrine seems to be maintained that the state has the power materially to

obstruct the navigation of a river. In Com. v. Breed, 4 Pick. 460, it was proved that a bridge built over a navigable stream prevented the passage of vessels that were accustomed to pass there before. And the court say that it was a power that had been exercised from the commencement of that government without objection. And they say further that, though great vigilance has been exercised in requiring bridges to be provided with suitable draws for the passage of vessels, yet in some instances the passage of vessels of a description which before had been accustomed to pass had been entirely prevented. And they say it rests with the legislature to determine when the public convenience requires these partial obstructions. There seems to have been no question made as to what would have been the effect of the exercise of the power of congress to regulate commerce. The supreme court of the United States have gone even further than the court of Massachusetts. The state of Delaware had authorized the erection of a dam across a navigable stream, and it was erected accordingly. Some persons navigating the creek with a vessel licensed and enrolled, took away the dam as an unlawful obstruction to the navigation. Suit was brought, and the question was raised as to the power of the state to erect the obstruction. And the supreme court, in conceding the power to the state, do it upon the express ground that congress had not legislated on the subject, admitting that it would be different if congress had ever exercised the power with which it was vested. Wilson v. Black Bird Creek Marsh Co., 2 Pet. [27 U. S.] 245.

In New York, the right of a state has been placed on somewhat narrower ground. The legislature of New York had authorized the construction of a bridge across the Hudson river, at Troy, where the tide ebbed and flowed, and it was navigable; but it was required to be done so that the stream should be restored to its former state, or in such manner as not to impair its usefulness. An information was filed on the part of the state, alleging that the place where the bridge was built was an arm of the sea, in which the tide ebbed and flowed, and navigable for vessels trading in pursuance of the acts of congress. The defendants relied upon the act of the legislature, and averred that they had left over the main or principal part of the channel an opening for a convenient and suitable draw to enable vessels navigating the river to pass and repass, and so as to restore the river to its former state, or in a sufficient manner not to have impaired its usefulness as a public navigable river. The point was thus made as to the power of the state to give the authority. It will be observed that there was no averment on the part of the people that the bridge, as constructed, essentially obstructed the navigation of the river. People v. Rensselaer & S.

R. Co., 15 Wend. 113. The court decided that it was the exercise of a valid power, but say, that the place where the bridge was built is one which coasting vessels have a right to pass, and where any obstruction entirely preventing or essentially impeding the navigation would be unlawful. They admit that a power exists in the states to erect bridges over navigable waters, if the wants of society require them, provided such bridges do not essentially injure the navigation of the waters which they cross. But they say that the power must be considered as surrendered by the states, so far as may be necessary for a free navigation. As has been already mentioned, the ordinance of 1787, with the exception of the anti-slavery article, was extended over some of the southwestern states, for instance, over Alabama. By that ordinance the new states were to be admitted into the Union upon an equal footing with the original states in all respects whatever. This applied to Illinois and to Alabama. It was a trust which the general government was obliged to fulfill. But when Alabama was admitted into the Union, there was a compact made by which all navigable waters within the state were to remain public highways, and free to all citizens of the United States. And the supreme court say, in Pollard's Lessee v. Hagan, already cited, that this compact would be void, if inconsistent with the constitution of the United States. Alabama being equal with the other states, no restriction could be imposed on that state which congress had not the right to impose upon others. If in the exercise of the power, congress could impose the same restrictions upon the other states as were imposed by that compact on Alabama, then it was a mere regulation of commerce among the several states, and therefore as binding on the other states as on Alabama; that is, as binding, if the power was exercised by congress: for obviously they do not mean to be understood as asserting that congress could not exercise this power as to some of the navigable rivers of the United States, leaving it dormant as to others. And they conclude, as by the compact congress had no more power over Alabama than over the original states, it was nothing more than a regulation of commerce to that extent among the several states.

It will be remembered that it had been decided in the leading case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, that the power to regulate commerce included the power to regulate navigation. If this be nearer to the circumstances under which Illinois was admitted into the Union, it will be difficult to distinguish between the two states in this respect. The ordinance of 1787 was extended to Alabama; but that ordinance only referred to the rivers leading into the Mississippi and St. Lawrence. Many of the rivers of Alabama flowed into the Gulf of Mexico, and therefore, when in 1819, it was proposed that

state should be admitted into the Union, it was one of the conditions, and, Alabama acceding to it, it became a compact of admission, that all the navigable rivers within the state should be forever free. This being so, the only question was whether there was anything for the compact to rest upon in the constitution of the United States. And the supreme court, as already mentioned in the case cited, decided that there was. Now it is not unimportant to observe, that in the resolution of congress admitting Alabama into the Union, it speaks of the ordinance of 1787, as articles of compact between the original states and the people and states in the territory northwest of the Ohio, and the same language is used in many of the acts of congress when referring to this ordinance. And in the act of congress authorizing the people of the Illinois territory to form a state government, it is required that their constitution shall not be repugnant to the ordinance of 1787, between the original states and the people and states of the territory northwest of the river Ohio. And the very preamble of the constitution of Illinois sets forth, that "the people of the Illinois territory, having the right of admission into the general government, as a member of the Union, consistent with the constitution of the United States, the ordinance of congress of 1787," &c. And when Illinois was admitted into the Union, on the 3d of December, 1817, the resolution referred to the ordinance as articles of compact between the original states and the people and states in the territory northwest of the river Ohio. There is great reason for saying, therefore, independently of the various statutes which have been referred to, that if the ordinance of 1787 is not in force in Illinois proprio vigore this part of it which we are now speaking of, is in force by virtue of the compact which may be said to have been made since the adoption of the constitution, between the United States and the states formed out of the northwest territory, and that the compact is binding on the states of the northwest territory, for the same reason that it is binding on Alabama, Mississippi or Louisiana. However this may be, that congress has always understood that the navigable rivers of the northwest leading into the Mississippi were free public highways, and so treated them, is most manifest. It may without exaggeration be said, that it has exercised in this respect, from the very foundation of the government, a vigilance that has never slept. Judge Woodbury, in giving a very elaborate opinion in the case of U. S. v. New Bedford Bridge [Case No. 15,867], says, that he has no doubt that the power to regulate commerce, vested in congress, authorizes it to keep open and free all navigable streams from the ocean to the highest ports of delivery or entry, if no higher, and to protect the intercourse between two or more states in all our tide waters. In Washington Bridge Co. v. State, 18 Conn. 53, there had been a bridge erected across the Housatonic, below a port of delivery. This was one of the objections taken, but the court refused to express an opinion on that point, deciding the case upon other grounds. There is a case not yet finally decided, but which is reported on an interlocutory order in 9 How. [50 U. S.] 647 (Pennsylvania v. Wheeling & B. Bridge Co.), which it may not be improper to refer to. (Since finally decided. 13 How. [54 U. S.] 519.) In that case no particular stress seems to have been laid on the fact that Pittsburgh was a port of entry, and it was not noticed in the pleadings that were originally filed in the supreme court. The state of Pennsylvania made application for the removal of the bridge at Wheeling, on the ground that it was an obstruction to the navigation of the Ohio, a navigable river, free to all the citizens of the United States. The defendants justified under charters from Virginia and Ohio, that they had complied with the provisions of the charters. There was a section in the charter from Virginia, which provided that if the defendants built a bridge which should be an obstruction to the river as usually navigated, it should be abated as a nuisance. The defendants admitted that the Ohio river was a free navigable river, but insisted that it did not essentially obstruct the navigation of the same, and introduced and relied upon an act of the legislature of Virginia, of January 11, 1850; which declared that the bridge built was in conformity with law. This of course was equivalent to saying that the bridge, as erected, was not an obstruction to the navigation of the river. And yet it is clear that the supreme court did not consider this act of the legislature of Virginia as conclusive upon all the world, because the main question referred to the commissioner, by the interlocutory order of the court, was to take proof whether or not the bridge was an obstruction to the free navigation of the Ohio river. And it is upon this report of the commission, that the cause is now being argued on the final hearing. In this case, to adopt the reasoning of the defendants would be in effect to admit that the act of the legislature could not be examined; in other words, that no citizen who was injured by an illegal act of the legislature could go behind it to show its illegality. It seems to me, therefore, that the pleas ought to go further than they have done, and they must deny that the bridge is a material obstruction, so that the plaintiffs may show, if they can do so, that it is, and that in consequence thereof, they have sustained the damage mentioned in the declaration.

[NOTE. Thereafter, by agreement, the Peoria Bridge Association was substituted as defendant in the place of the defendants herein. Defendants had previously amended their pleas by leave of the court, and, issue being joined, there was a trial, but the jury, being unable to agree, were discharged by consent of the parties. The suit was subsequently compromised. See Case No. 3,046.]