### HUSE and others v. GLOVER and others.*

*(Circuit Court, N. D. Illinois. 1883.)*

1. NAVIGABLE WATERS—IMPROVEMENT—POWER OF STATE.

The state of Illinois, in the absence of national legislation upon the subject, can improve the navigable waters within its limits in such mode and to such extent as to her seems best.

2. SAME—TOLLS FOR USE OF LOCKS—STATUTE CONSTITUTIONAL.

The statutes authorizing tolls to be exacted for the use of the locks on Illinois river are not in conflict with that clause in the national constitution which forbids a state, without consent of congress, from laying duties of tonnage.

In Equity.

*Geo. S. Eldridge*, for complainants.

*Edsall, Hawley & Edsall, James McCartney*, Atty. Gen. of Illinois, and *Lawrence, Campbell & Lawrence*, for defendants.

HARLAN, Justice. This is a suit in equity. The present hearing is upon demurrer to the bill. The complainants, constituting the firm of Huse, Loomis & Co., are, and since 1864 (besides a general transportation business) have been, largely engaged in cutting ice at Peru and other points on the Illinois river, and in transporting the same on that river, thence by the Mississippi and other navigable streams to markets in different states. In the conduct of their business they have employed from three to six steam-boats and from thirty to sixty barges, all duly registered and licensed in accordance with the laws of the United States. The defendants are canal commissioners, appointed in pursuance of certain statutes of Illinois, which provided, among other things, for the construction of locks and dams on Illinois river at Henry and at Copperas Creek. The former were completed in 1872 and the latter in 1877, at an aggregate cost of about $854,-739.42, the whole of which was paid by this state except about the sum of $62,359 paid by the United States. By the statutes referred

*Affirmed. See 7 Sup. Ct. Rep. 313.

to the commissioners were authorized to establish and collect reasonable tolls for the passage and use of the locks by boats. To that end a schedule was adopted, in accordance with which complainants have been required to pay and have paid, always under protest, tolls for the passage of the locks by their boats, such tolls being ascertained, as to amount, upon the basis of the tonnage measurement of the boats and their cargoes. From the construction of the lock at Henry, up to the spring of 1872, complainants paid to the canal commissioners, for the passage of that lock, in tolls or charges, nearly $3,000 upon the tonnage measurement of their boats, and about $5,000 upon their cargoes of ice in ice-barges towed by such boats. Their average shipments each subsequent year have been quite as large, and upon such shipments tolls have been exacted and paid by them. The prayer of the bill is that the defendants, their agents, servants, and employes, be restrained from imposing and exacting from complainants any tolls or other charges for the right of passage through the locks by steam-boats, ice-barges, and other vessels used in the transaction of their business on the Illinois river.

The substantial grounds upon which complainants proceed are, briefly stated, these: That the locks and dams so constructed by the state not only do not aid or promote their business, but are practical impediments in the way of its prosecution, and to the free navigation of the Illinois river; that their construction and the imposition by the canal commissioners of tonnage duties, under the name of tolls, upon the boats and cargoes of complainants, are in violation—*First*, of that part of the ordinance for the government of the north-western territory which provides that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor;" *second*, of section 10, art. 2, of the national constitution, which prohibits any state, without the consent of congress, from laying any "duty of tonnage;" and, *third*, of section 8, art. 1, of the constitution, which invests congress with power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

It seems to the court that most of the questions discussed by counsel are concluded, some directly, others substantially, by the adjudged cases.

In *Wilson* v. *Blackbird Creek Marsh Co.* 2 Pet. 245, the question was whether the legislature of Delaware could, consistently with the national constitution, authorize a dam to be constructed across Blackbird creek, in that state. That stream, although wholly within the limits of Delaware, was conceded to be a public navigable highway, in which the tide ebbed and flowed, and was capable of being used, and theretofore had been used, by sloops and other vessels enrolled and licensed under the laws of the United States. After stating that the value of the property on the banks of the creek was enhanced by excluding the water from the marsh; that the health of the inhabitants in the vicinity was thereby probably improved; and that measures calculated to effect such results were within the reserved powers of the state so long as they did not come in collision with the powers of the general government,—the court, speaking by Chief Justice MARSHALL, said:

"But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. The counsel for plaintiff in error insist that it comes in conflict with the power of the United States 'to regulate commerce with foreign nations, and among the several states.' If congress had passed any act which bore upon the case,—any act in execution of the power to regulate commerce,—the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern states, we should not feel much difficulty in saying that a state law coming in conflict with such act would be void. But congress has passed no such act. The repugnancy of the law of Delaware to the constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several states,—a power which has not been so exercised as to affect the question. We do not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject."

In *Gilman* v. *Philadelphia*, 3 Wall. 713, the supreme court sustained the constitutional validity of an act of the legislature of Pennsylvania, which authorized the construction of a bridge across the Schuylkill, one of the navigable waters of the United States, although the effect of that structure was not only to seriously impair the value of wharf property above the contemplated bridge, but to prevent the navigation of the river by certain vessels theretofore accustomed to

use such wharves. While recognizing, to the fullest extent, the power of congress to control, in the interest of commerce, the navigable waters of the United States, so as to keep them free of all obstructions, whether interposed by the states or by private persons, the supreme court—affirming the doctrines of *Cooley* v. *Wardens*, 12 How. 299—said that there were some subjects connected with commerce which called for uniform rules and national legislation, while others were best regulated by rules and provisions suggested by the varying circumstances of localities, and to be enforced under the authority of the states, so long as congress did not act. Speaking by Mr. Justice SWAYNE, the court further said:

" It must not be forgotten that bridges which are connecting parts of turnpikes, streets, and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs. It is for the muncipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other. The states have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it; subject, however, in all cases, to the paramount authority of congress, whenever the power of the states shall be exerted within the sphere of the commercial power which belongs to the nation."

The opinion in that case concludes with these words:

" The river being wholly within her limits, we cannot say that the state has exceeded the bounds of her authority. Until the dormant power of the constitution is awakened and made effective by appropriate legislation, the reserved power of the states is plenary, and its exercise in good faith cannot be made the subject of review by this court."

In *Ry. Co.* v. *Fuller*, 17 Wall. 569, in illustration of these doctrines, it was said:

" When a stream, navigable for the purposes of foreign or interstate commerce, is obstructed by the authority of a state, such exercise of authority may be valid until congress shall see fit to intervene. The authority of congress in such cases is paramount and absolute, and it may compel the abatement of the obstruction whenever it shall deem it proper to do so."

In *Pound* v. *Turk*, 95 U. S. 462, the supreme court sustained the validity of a statute of Wisconsin which authorized the construction of a dam across a navigable river wholly within its limits. After referring to the fact that there were navigable streams in many of the states, whose greatest value in water carriage is as outlets to sawlogs, sawed lumber, coal, salt, etc., the court, speaking by Mr. Justice MILLER, said:

"In order to develop their greatest utility in that regard, it is often essential that such structures as dams, booms, piers, etc., should be used, which are substantial obstructions to general navigation, and more or less so to rafts and barges. But to the legislature of the state may be most appropriately confided the authority to authorize these structures, when their use will do more good than harm, and to impose such regulations and limitations in their construction and use as will best reconcile and accommodate the interests of all concerned in the matter. And since the doctrine we have deduced from the cases recognizes the right of congress to interfere and control the matter whenever it may deem it necessary to do so, the exercise of this limited power may all the more safely be confided to the local legislatures."

In *Transp. Co.* v. *Chicago,* 99 U. S. 635, the court, through Mr. Justice STRONG, said: "It has long been held that navigable rivers wholly within a state are not outside of state jurisdiction so long as congress does not interfere."

In addition to these decisions in the supreme court of the United States, reference is made to *Heerman* v. *Beef Slough, etc.,* 8 Biss. 334; U. S. v. *Beef Slough Manuf'g Co.* Id. 424; and U. S. v. *New Bedford Bridge,* 1 W. & M. 401.

The doctrines of the adjudged cases sustain the authority of this state—there being no act of congress forbidding it—to construct locks and dams upon the Illinois river. Her avowed object in so doing was to improve the navigation of that river and effect a reduction of freights to the headwaters of Lake Michigan and to the Mississippi river. The mode and extent of such improvement, in the absence of national legislation, based upon the power of congress to regulate commerce, was for her determination. Her discretion in such matters is not to be controlled by the courts so long as congress does not interfere. That locks and dams cause some delay to, or in some degree affect the interests of, those whose business on the Illinois river does not absolutely require the use of such instrumentalities, may be conceded. But if, in the judgment of the state, which has jurisdiction over all persons and things within its limits, except as restrained by the national constitution, the system of locks and dams is more advantageous to the general public than the river in its natural condition; if she deems it important to improve the navigation of the Illinois river, although thereby certain classes engaged in commerce may be subjected to inconveniences which do not exist in the use of the river in its unimproved or natural condition,—her determination in the premises is not to be questioned by any authority except congress. Until the national legislature interposes its paramount authority, the state cannot be controlled by the judiciary as to the mode and extent

of improving such navigable streams as are wholly within her limits.

Nor do we perceive that the power of the state in this respect is in any degree affected by the ordinance of 1787, even if that ordinance, as to the matters now under consideration, be not superseded by the constitution of the United States. *Strader* v. *Graham*, 10 How. 94; *Permoli* v. *Municipality, etc.*, 3 How. 589; *Pollard's Lessee* v. *Hagan*, Id. 224; *Woodman* v. *Kilburn*, 1 Biss. 546; *Columbus Ins. Co.* v. *Curtenius*, 6 McLean, 209. Illinois entered the Union upon terms of equality in all respects with the states which existed at the time the constitution was formed. In the statute of Virginia, authorizing the cession to the United States of the territory north-west of the Ohio river, and in the deed of cession, one of the conditions prescribed was that the states formed out of that territory should be admitted "members of the federal Union, having the same rights of sovereignty, freedom, and independence as the other states." The ordinance itself provided for the admission of the new states "on an equal footing with the original states, in all respects whatever." So that, it seems to the court, Illinois has as full power and jurisdiction over her navigable streams as Virginia has over the navigable streams within her limits. But if her powers in that respect are in any degree affected or controlled as to their exercise by the ordinance of 1787, it is not perceived that the position of complainants can be maintained. The recognition of the right of the state, when unrestrained by acts of congress, to improve navigable streams within her borders, in such manner and to such extent as to her seems conducive to the public interests, is not necessarily inconsistent with the provisions of that ordinance. The declaration therein that the navigable streams leading into the Mississippi river shall be common highways, and be forever free to the inhabitants of the territory and to citizens of all the states, was certainly not intended as an inhibition upon the improvement of such highways by the federal government or by the respective states formed out of the north-west territory. We cannot suppose that Virginia intended, when ceding this vast domain, to withhold from the future states to be erected therein that control of navigable streams which, upon the adoption of the constitution, she would have over those within her own limits. The utmost, perhaps, which can be claimed is that that provision was intended to secure the use of such navigable streams as highways upon terms of equality; that is, without discrimination against inhabitants of that terrritory or against citizens of any of the United States. The Illinois river is none the less a common highway because its nav-

igability has been improved so as to meet the wants of the public in a larger degree than it was capable of doing in its natural state. It is still a common highway, for use. alike by all citizens of the United States under regulations which do not seem to be inconsistent with the ordinance of 1787. Besides, in the opinion of the court, the rights secured by the provisions of that ordinance, so far as it relates to navigable streams, are in substance secured by the constitution of the United States. Consequently, if that which Illinois has done towards the improvement of the Illinois river be not forbidden by the national constitution, it is not in conflict with the provisions of the ordinance of 1787.

The only remaining question which we deem necessary to consider relates to the right of the state to charge tolls for the passage and use of these locks, such tolls being based upon the tonnage measurement of the boats and their cargoes. It is contended by complainants that the exaction of these tolls is inconsistent with that clause of the constitution which prohibits the states, without the consent of congress, from laying any duty of tonnage. The court is of opinion that the right of the state to charge for the use of its locks may be placed upon the same ground upon which rests the authority of municipal corporations, owning improved wharves upon the navigable waters of the United States, to charge for the use of such wharves by vessels, even those licensed under the laws of the United States and engaged in commerce with foreign nations or among the several states. Municipal regulations of this character have been maintained even where the wharfage fees are measured by the tonnage of the vessel using the wharves. Such fees, so measured, are not deemed duties of tonnage within the meaning of the constitution, where they are exacted, not for the mere privilege of landing at a wharf, but as fair and reasonable compensation for the use of additional facilities furnished for those engaged in commerce. *Packet Co.* v. *St. Louis*, 100 U. S. 429; *Vicksburg* v. *Tobin*, Id. 430; *Packet Co.* v. *Keokuk*, 95 U. S. 80. So in reference to tolls for the use of locks constructed on a navigable stream lying wholly within a state. Although measured by the capacity of the vessel or the extent of the cargo, they are not, necessarily, tonnage duties, which the states are prohibited from laying. They are not, within the meaning of the constitution, duties upon the vessel or its cargoes, but compensation exacted for the use of improved commercial facilities. In this case it cannot be claimed that the charges exacted by the commissioner are disproportioned to the amount expended by the state in the con-

struction of these locks and dams, or that they are, in themselves, unreasonable in amount. Referring to that clause in the ordinance of 1787 which prohibits any tax, impost, or duty upon the right to navigate the navigable waters therein described, Mr. Justice Mc-Lean, in *Spooner* v. *McConnell,* 1 McLean, 337, said:

"The provisions of the ordinance had reference to the navigable waters and the carrying places as they then were. And in that state they were to remain free, without tax, etc. But this does not prevent the legislature from improving the navigation of rivers and the carrying places between them. Such improvements can in no sense be considered as repugnant to the ordinance, but in promotion of its great object. And it would seem to be no violation of the compact if the legislature should exact a toll, not for the navigation of the rivers in their natural state, but for the increased facilities established by the funds of the state."

It is unnecessary to extend this discussion. The court is of opinion, for the reasons given, that the state of Illinois has the same power to improve the navigable waters within her limits that she possesses over other highways; and where money has been expended in making improvements it is competent for the state to impose tolls for their use, even where the stream is one to which the regulations of commerce may be extended. This statement of the rule is, however, subject always to the qualification that the action of the state, touching navigable streams within her borders, is subordinate to the paramount authority of the nation, whenever and as it may be exercised, under the power granted to congress of regulating commerce with foreign nations and among the several states.

Let the demurrer be sustained; and if the complainants do not wish to amend, an order may be rendered dismissing the bill, with costs to defendants.