HATCH and another *v.* THE WALLAMET IRON BRIDGE CO.

*(Circuit Court, D. Oregon.* March 28, 1881.)

1. JURISDICTION.

A suit arises out of a law of the United States when the controversy involved in it turns upon the proper construction or application of such law; and therefore a suit by the owner of a vessel authorized to engage in the coasting trade upon the Wallamet river, and by riparian owners thereon, to enjoin the erection of a bridge over said river at Portland, as being in violation of the act of congress under which said vessel was enrolled and licensed, and the act of congress (11 St. 383) declaring said river a free and common highway, arises under said laws, whether the plaintiffs are entitled to the relief sought or not.

2. NAVIGABLE WATERS—CONTROL OF.

The power of congress to regulate commerce (Const. art. 1, § 8) includes, for the purposes of commerce, control of all the navigable waters of the United States which are accessible from a state, other than the one in which they lie; and, for this purpose, they are the waters of the nation, and subject to the legislation of congress in every particular affecting their navigability or use as instruments or means of commerce.

3. BRIDGES—NAVIGABLE WATERS.

The state has the sole power to bridge the waters within its limits, but this power is subject to the power of congress to prevent obstructions to navigation being placed in such waters within the state, and accessible from without it; and therefore, in the absence of legislation, by congress to the contrary, a state may dam or otherwise obstruct the navigable waters within its limits at pleasure.

4. CONGRESSIONAL ACTION—CONSTRUCTION OF.

The acts of congress authorizing a vessel to engage in the coasting trade within a state are construed as not manifesting an intention upon the part of congress to interfere with the power of the state to obstruct the navigable waters within its limits, but only to authorize their navigation by such vessel for the purposes of such trade, so long as they are navigable.

5. SAME.

The provision in section 2 of the act of February 14, 1859, (11 St. 383,) admitting Oregon into the Union, which declares that "all the navigable waters of said state shall be common highways and forever free" to all the citizens of the United States, is paramount to a law of the state authorizing a bridge to be erected across the Wallamet river; and therefore, if such bridge as proposed to be constructed will materially impede or obstruct the free navigation of said river, it is unlawful, and the parties constructing it may be enjoined at the suit of riparian owners injured thereby.

6. INJUNCTION GRANTED.

> A preliminary injunction granted to restrain the building of a bridge over the Wallamet, with a draw of only 100 feet on either side of the pivot pier, under the authority of an act of the state legislature authorizing the building of such bridge, with a good and sufficient draw of not less than 100 feet, upon evidence showing that such a bridge would materially obstruct the navigation of the river, because said act did not absolutely authorize a bridge with a draw of only 100 feet, and if it did it was in conflict with the act of congress of February 14, 1859, *supra*, declaring the river a free and common highway, and therefore it is void.

Suit in Equity for an Injunction. Motion for preliminary injunction.

*Todd Bingham, E. C. Bronaugh,* and *Edward Bingham,* for plaintiffs.

*H. Y. Thompson* and *George H. Durham,* for defendant.

DEADY, D. J. On October 18, 1878, the legislature of Oregon passed an act authorizing the "Portland Bridge Company," a corporation incorporated under the laws of Oregon, "or its assigns," to build a bridge, "for all purposes of travel or commerce," across the Wallamet river between Portland and East Portland, "at such point or location on the banks of said river" as it might select, "on or above Morrison street, of said city of Portland:" "*provided,* that there shall be placed and maintained in said bridge a good and sufficient draw, of not less than 100 feet in the clear in width of a passage-way, and so constructed and maintained as not to injuriously impede and obstruct the free navigation of said river, but so as to allow the easy and reasonable passage of vessels through said bridge." On July 16, 1880, the defendant,—the Wallamet Iron Bridge Company,—as the assignee of said Portland Bridge Company, commenced the erection of a bridge across the river from the foot of Morrison street, in Portland, to N street, in East Portland. At this point the river is about 1,400 feet wide at extreme low water, with a depth of not less than 50 feet for 200 feet from the Morrison-street wharf along the line of the proposed bridge, whence it gradually shoals to 23 feet at a further distance of 250 feet. The river rises in the winter months from the rains, and in the spring is backed up by what is known as the June rise in

the Columbia. The highest water is 28 feet above low water, and during the past winter the rise was 21.6 above low water. The current in the ship channel along the line of the proposed bridge is nearly parallel with the direction of the opening between the piers, and varies in velocity from one to seven miles an hour, and at average high water is from three to four miles an hour. During the winter months strong southerly winds blow down the river for days at a time. The abutment pier is to be placed at the bank in front of the Morrison-street wharf, and the spaces between the next five piers are as follows: The first, 180 feet; second, a space on either side of the draw-pier of 100 feet each; and then two spaces of 200 feet each. The piers are constructed by driving piles inside of wooden cribs, and filling the spaces between them with loose stone up to a little below low-water mark, and above with iron tubes filled with concrete, except the draw-pier, which is to be of masonry above low water. The spans are to be of wood, except the draw, which is to be of iron. The lower chord is to be eight feet above high water. The five piers east of the western abutment are now above low water.

On January 3d the plaintiffs filed their bill in this court to enjoin the defendant from constructing this bridge, on the ground that the same is and will be a serious and unlawful obstruction to the navigation of the river. Among other things, the bill alleges that Lownsdale is the owner of an interest in wharves and warehouses on blocks 73 and 74 of Portland, on the west bank of said river,—a distance of about 600 feet above the location of said bridge,—of the value of $10,000, and that the plaintiff Hatch is the lessee of the whole of said property for a term of years at a rent of $700 per month; that a large portion of the commerce of the Wallamet valley has been done through and at said wharves and warehouses; that a large portion of the wheat raised in said valley has been received and stored there for shipment in sea-going vessels to foreign ports; that vessels carrying 2,000 tons can navigate the channel on the west side of the river for a distance of a mile above Morrison street, and therefore

that bank is now occupied by wharves and warehouses engaged in the commerce of the Wallamet valley, and other portions of the coast and Europe; that the space allowed for a draw in said bridge is too narrow to admit the passage of vessels with safety, and therefore they cannot and will not come to complainants' wharves to discharge and receive cargo, to their great and permanent injury; that the plaintiff Hatch is the owner of an enrolled and licensed steamboat— the A. A. McCully—which is employed in towing vessels to and from the wharves aforesaid upon the river aforesaid, and that the erection of said bridge with so narrow a draw-opening prevents the same from being done with safety, to his injury.

It appears from the affidavit of C. H. Gorril that he and his brother, R. W. Gorril, of California, are stockholders in the defendant corporation, and are engaged as contractors in the construction of the bridge; that they are to receive $150,000 for the work, and are under bonds in the sum of $20,000 to complete the same by April 1, 1882; that they have expended on the work $50,000, including the purchase and preparation of the timber and lumber for seven of the eight spans, and all the iron for the same, and that if not restrained by this court they will complete the bridge by June 1st.

Section 1 of the act of March 3, 1875, (18 St. 470,) which, among other things, gives this court jurisdiction of a suit in equity arising under a law of the United States, includes this case.

Congress has power "to regulate commerce with foreign nations and among the several states, "(Const. art. 1, § 8;) and this includes, for the purpose of commerce, the control of all the navigable waters of the United States which are accessible from a state other than that in which they lie. For this purpose they are the waters of the nation, and subject to the legislation of congress in every particular affecting their navigability or use as instruments or means of commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1; *Penn.* v. *W. & B. Bridge Co.* 18 How. 431; *Gilman* v. *Philadelphia,* 3 Wall. 724.

In pursuance of this power to regulate commerce congress has provided (title L of the Rev. St.) that certain vessels, when enrolled and licensed as required by law, shall have the right to engage in the coasting trade; that is, the trade upon the navigable waters of the United States. The plaintiff Hatch is the owner of a vessel so enrolled and licensed for this district, and his contention is that this bridge will and does prevent the enjoyment of this right, and therefore this suit arises out of a law of congress, as applied to the facts and circumstances of the case.

Again, the act of congress of February 14, 1859, (11 St. 383,) admitting Oregon into the Union, provides (section 2) "that all the navigable waters of said state [Oregon] shall be common highways and forever free, as well to the inhabitants of said state as to all other citizens of the United States, without any tax, duty, toll, or impost therefor." Both the plaintiffs are riparian proprietors upon the stream over which this bridge is being built, and their contention is that it does and will obstruct the navigation of the river so as to prevent its being used as a common highway, to their injury as such proprietors, and therefore this suit arises out of a law of congress as applied to the facts and circumstances of the case.

To sustain jurisdiction under this clause of the act of 1875, *supra*, it is not necessary to show or assume that the plaintiffs are entitled to the relief sought, but it is sufficient if the controversy turns upon or grows out of the proper construction or application of these acts of congress, or either of them.

The power to authorize the erection of a bridge over a navigable water of a state, for the convenience of the inhabitants thereof, belongs to the state as a part of its general police power. Congress does not possess this authority directly, *eo nomine;* but its control over the navigable waters of the states, as a means of commerce, gives it a practical veto upon the power of the state in this respect. Therefore, no state can authorize or maintain the erection of a bridge over a navigable water, which in effect contravenes or conflicts with the law of congress concerning the navigation of the same; and the fact

that such water is wholly within the state is immaterial, if it is accessible from another state, or forms a part of a navigable way between itself and other states.

If, then, this bridge, in its construction or effect, is in conflict with either of those acts of congress, it is so far unlawful; and, if injurious in its operation to the rights of the plaintiffs, is a nuisance, and may be prevented or abated. But if it does not contravene such law, then, however it may inconvenience or obstruct the navigation of the river, this court cannot interfere. The power of congress to regulate the navigation of the river does not execute itself; nor can this court enforce it until congress has declared its will on the subject. Until then the power is dormant, and the authority of the state is sufficient to justify any structure or obstruction that may be placed therein.

In this case the defendant insists that it is building this bridge in pursuance of a law of the state, and that there is no law of congress upon the subject to the contrary, and therefore it is lawful. Does the law under which Hatch's steam-boat is authorized to engage in the coasting trade conflict with the act of the legislature authorizing this bridge? Upon the authorities I do not think it does. The supreme court seems to have been careful not to declare a conflict between state and federal legislation on this subject upon mere implication; and the reason of this is apparent. Congress can at any time declare specifically what shall be a lawful bridge and what shall not; and as it belongs more properly to the political than the judicial power to determine such questions, the courts will not assume that a bridge is an unlawful obstruction because it incidentatly conflicts with or limits some right or privilege claimed or existing under an act of congress.

A license to engage in the coasting trade means something. As was said by Mr. Justice Swayne, in *Gilman* v. *Philadelphia, supra,* it "carries with it right and authority. 'Commerce among the states' does not stop at the state line. Coming from abroad it penetrates wherever it can find navigable waters reaching from without into the interior, and

may follow them up as far as navigation is practicable." And in *Gibbons* v. *Ogden, supra,* it was held that a law of the state of New York, giving certain persons the exclusive right to navigate the waters of that state by vessels propelled by steam or fire, as against such license, was void. In this last case the law of the state was in direct conflict with that of congress. The latter said, in effect, to its licensee, "You are authorized to navigate the waters of New York with vessels propelled by steam," while the former said "You shall not do so." But in this case there is no necessary conflict between the law of the state and the United States. A license to engage in the coasting trade on the Wallamet river is a license to navigate only so far as it may be navigable. But if the state, in the exercise of its police power to build bridges, obstructs, or even destroys, the navigation of the river, the weight of authority, and, I think, of prudential reason, is that the act of congress licensing the plaintiff's steam-boat to navigate it is not thereby infringed. It is thought to be safer for the courts not to assume that congress intended to interfere with and restrain the power of the state over the navigability of the rivers within its jurisdiction until it says so directly or by necessary implication. Therefore, in the cases of *Wilson* v. *Blackbird Creek Marsh Co.* 2 Pet. 245; *The Passaic Bridges,* 3 Wall. 782; and *Gilman* v. *Philadelphia,* Id. 713, it was held that the enrollment and license acts which authorized vessels to navigate the waters of particular states were not sufficient to warrant the inference that congress thereby intended to interfere with the right of the states to dam or otherwise obstruct the navigation of said waters.

Does the act of February 14, 1859, *supra,* conflict with the act of the state legislature authorizing the erection of this bridge? This act, unlike the one providing for the enrollment and license of vessels, relates directly to the navigability of the waters within the state. Its only purpose is to preserve them for the free use of all the citizens of the United States as common highways. It was passed by congress in pursuance of its control over them as a means of commerce, (*Pollard* v. *Hogan,* 3 How. 229,) to secure their

free navigability to the inhabitants of the Union, against the possible exactions and obstructions of local authority, prompted by considerations of local convenience or selfishness. The provision, even to its very language, is as old as the articles of compact between the original states and the people and the states of the territory north-west of the Ohio, contained in the ordinance of 1787, for the government of said territory, from the fourth of which it is copied. This ordinance was ratified or recognized by the first congress under the constitution, (1 St. 50,) and the provision securing the freedom of "the navigable waters leading into the Mississippi and St. Lawrence" has been continued in force in all the states formed out of said territory to this day. *Columbus Ins. Co.* v. *Curtenius,* 6 McLean, 209.

In *Penn.* v. *W. & B. Bridge Co.* 13 How. 518, it was held that a provision in a compact (December 18, 1789) between Virginia and Kentucky concerning the erection of the latter into a state, to the effect that the navigation of the Ohio, so far as the territory of the two states joined thereon, "shall be free and common to the citizens of the United States," which was afterwards sanctioned by congress in the passage of the act (1 St. 189) admitting Kentucky into the Union, was a restraint upon the power of Virginia to obstruct the navigation of said river by the erection of a bridge thereon within her own limits, and that a bridge so erected, which was a substantial obstruction to such navigation, was a nuisance and unlawful.

To the same effect is the decision in *Columbus Ins. Co.* v. *Curtenius, supra,* in which it was held that congress had declared, by the ordinance of 1787 and otherwise, that the navgable tributaries of the Mississippi were free and common highways to the citizens of the United States, and that therefore an act of the legislature of Illinois, authorizing the construction of a bridge across the Illinois river, near Peoria, was void if such bridge was a material obstruction to the navigation of said river, as being in conflict with the federal legislation declaring it free and common.

These decisions are the authoritative and uncontradicted

exposition of the effect of federal legislation declaring a navigable river forever free and common to the citizens of the United States, upon the otherwise unlimited power of a state to obstruct or impede the navigation thereof within its own limits. And the reasoning upon which they rest seems unanswerable. It is self-evident that a river cannot be a common highway, forever ·free to all the citizens of the United States, which the legislature of any one state has the power to essentially obstruct.

In a well-considered case cited by the defendant, (*The People* v. *S. & R. Ry. Co.* 15 Wend. 132,) in which the right to bridge the Hudson river, in pursuance of an act of the state legislature, was under consideration, Mr. Chief Justice Savage announced the same conclusion, saying: "The place where * * the bridge is built is one which coasting vessels have a right to pass, and where any obstruction entirely preventing or essentially impeding the navigation would be unlawful."

In comparing the federal and state acts to ascertain if there is any conflict between them, the circumstances of the case—that is, the character and relative importance of the river and the commerce dependent thereon, and the character and need of the bridge and the commerce dependent upon it —must be considered. For, although congress has, in effect, declared the Wallamet river to be forever a "free" and "common highway," yet these terms are used with the implied understanding that the state has the power to bridge it, if it can do so without materially impeding the navigation. What is such an impediment may be a difficult question to decide. It may depend much upon circumstances. A bridge of a certain character at a certain place may be of great benefit and convenience to a few people, or some petty local trade or business, but a serious inconvenience or injury to many people and a valuable and extensive commerce.

The commerce of Oregon, both domestic and foreign, is largely dependent upon the free navigation of the Wallamet river. Steamboats ply upon it most of the year for 100 miles or more south of Portland. At Portland the tide ebbs and

flows, and from there to its mouth, a distance of 12 miles, it is navigated by sea and inland vessels, foreign and domestic, sail and steam, that go thence up and down the great Columbia, out upon the Pacific ocean, and to all the principal ports of the world. It is the harbor of Portland, the emporium and financial center of the north-west, where the valuable products of the country are gathered from far and near and stored for market and exportation, and the imports from sister states and foreign countries are received and distributed throughout the interior. In the near future we may expect a large increase of population at this place, and throughout the country with which it maintains business relations, and the commerce of Portland will demand the free use of the harbor and water front, as far south as it can be made useful.

The present need of a bridge is to furnish a more convenient and certain means of crossing the river than a steam-ferry to the small population that live in East Portland and the neighboring villages, some portion of the passengers to and from Portland on the east-side railway, the rural population that live on the narrow strip of country between East Portland and the Columbia river, and the transportation of their limited dairy and garden products to the Portland markets. It is not intended by this statement to suggest that there is no need of a bridge across the river at this place, but only that the interests which may be promoted by it are as a drop in the bucket compared with those that may be seriously inconvenienced or injured by it. With this brief sketch of the circumstances, I proceed to consider whether the act authorizing the building of the bridge is in conflict with the act of congress declaring it a free and commercial highway. The bridge is required to be built so "as not to injuriously impede and obstruct the free navigation of the river." But the defendant claims that the provision requiring the draw to be not less than 100 feet is equivalent to declaring that a draw of 100 is sufficient. My own impression is that the act ought to be construed as authorizing a bridge which would not materially interfere with navigation, and to this end that the draw must be at least 100 feet, and as much

longer as necessary, and that the defendant is not justified thereby in building a bridge with a draw of only 100 feet, if that would materially interfere with the navigation.  But if the construction claimed by the defendant is the correct one, it comes to the same thing in the end.  The legislature of the state has not the power to say absolutely that a bridge may be built with only a draw of 100 feet, for if such a bridge interferes materially with the free navigation of the river, the act authorizing it is void, as being in conflict with the paramount law,of congress declaring the river a free and common highway.  Therefore it is that a bridge ought not to be attempted to be built across such a water as this, where so many and valuable interests are involved, without the sanction of congress, given through the engineer department. The proper location and elevation of a bridge across the river at this place, and the length and place of draw,—all the circumstances considered,—are questions that more properly pertain to the political than the judicial department of the government.

There the matter may be "equitably adjusted," so to speak, according to the circumstances of each case.  Here, the court can only ascertain whether the proposed structure interferes materially with the free navigation of the river, and if it does, it must declare it unlawful.

Accordingly, within the past 15 years, congress has been induced to legislate generally and specially upon the subject of bridges across the Mississippi and its tributaries.  By the act of December 17, 1872, (11 St. 398,) it is provided that no bridge can be built across the Ohio river without complying with the directions of that act, one of which is that every bridge below the suspension one at Cincinnati shall have a high span of 100 feet above low water, with a space of 400 feet between the piers, and a pivot draw, with two clear openings of 160 feet each; and by act of April 1, 1872, (17 St. 44,) a railway bridge was authorized across the Mississippi, near Clinton, Iowa, with a draw of not less than 160 feet,—the same to be located, built, and kept subject to the directions of the secretary of war for the security of naviga-

tion, subject even then to be abated as a nuisance by a suit in the United States court, if it should prove an obstruction to the navigation of the river; and by the act of June 4, 1872, (17 St. 215,) it is provided that all bridges thereafter built across the Mississippi, by authority of congress, shall be subject to the same direction and control of the secretary of war.

By an act of July 25, 1866, (14 St. 244,) congress authorized the building of seven bridges across the Mississippi at different points above St. Louis, and one across the Missouri at Kansas City, and provided that each of them should have two draw openings of not less than 160 feet in the clear. By acts of February 24, 1871, (16 St. 430,) and March 3, 1871, (Id. 473,) bridges were authorized across the Missouri river at Omaha, Nebraska, and Louisiana, Missouri, with two draw openings of not less than 200 feet in the clear.

These citations of congressional action might be multiplied greatly. See report of Governeur K. Warren, U. S. major of engineers, on bridging the Mississippi between St. Paul and St. Louis, 1878, pp. 193, 202. Indeed, congress has spoken on the subject of bridging the Wallamet at this place. By act of February 2, 1870, (16 St. 64,) the city of Portland was authorized to bridge the river, under the direction of the secretary of war, so as "not to obstruct, impair, or injuriously modify the navigation" of the same. This act expired by its own limitation within six years, and nothing was done under it but an examination and approval of a plan by a board of engineers and the secretary, December 30, 1872.

By this plan the bridge was located at the foot of Columbia street—1,820 feet above Morrison—and was to have a draw of 100 feet in the clear on each side of the pivot pier. And on June 23, 1874, (18 St. 281,) congress authorized the Oregon & California Railway Company to bridge the Wallamet river at Portland, under the direction of the secretary of war in all respects, except that the draw should not be less than 300 feet in width, so as "not to obstruct, impair, or injuriously affect the navigation of the same." Nothing has been done under this act, but it is still in force.

Taking these instances of congressional action as a reason-
v.6,no.4—22

able indication as to what is necessary in the construction of a bridge over this and other navigable waters of no more importance than this, and navigated with vessels of less tonnage, to prevent the navigation from being injuriously affected thereby, and weighing the testimony in the case, I think this bridge is such an obstruction to the navigation of the Wallamet as prevents its being a free and common highway to the citizens of the United States, and is therefore a nuisance, and unlawful. Indeed, I have no doubt of it. Forty-two persons, mostly navigators, including, I think, nearly all the pilots on the Columbia and Wallamet rivers, testify unqualifiedly that the draw is too narrow, and ought to be 200 feet instead of 100; and that in the winter season especially, the time when vessels usually load with grain for foreign ports, owing to the strong currents and high winds, it will be very unsafe to go through the draw with a good-sized river steam-boat, let alone a tug and sail vessel occupying a space from 70 to 80 feet.

The United States engineer in charge of the river and harbor improvements in this district, Col. George L. Gillespie, U. S. A., reports to the chief of engineers at Washington, on December 29, 1880, at length upon the subject of this bridge, and concludes that it should have been located at Columbia street; but if allowed to be constructed at Morrison, the draw should be enlarged to not less than 200 feet, and that a bridge there with a draw of only 100 feet will result in frequent loss to shipping, and may prevent sea-going vessels from going above the bridge altogether. In reply to this mass of testimony the defendant has introduced six affidavits, one of them being from the contractor, and another from the president of the company; only two of them being from river pilots. The principal point made in them is that the bridge will be more dangerous to navigation if left in its present condition than if completed. But a sufficient answer to this is that a court may require by the injunction that the defendant undo what he has done amiss, as well as to refrain from so doing. *C. S. U. Co.* v. *V. & G. H. W. Co.* 1 Sawy. 482. In my judgment the preliminary injunction should be allowed. The

defendant ought not to be permitted, against this showing, to place this structure in the river until its right to do so is definitely ascertained and determined. I am surprised that any person should have the hardihood to undertake such an important enterprise, in the face of the act of February 14, 1859, *supra,* declaring the river a common highway, and the congressional legislation of the last 15 years upon the subject of bridging navigable waters of the United States, without first obtaining the sanction of congress.

But this being a matter of some moment to the defendant, I have concluded to delay the issuing of the injunction until the first day of the next term, April 11th, or as soon thereafter as the circuit judge is present, when the matter may be further heard, if the defendant desires it; and in the meantime the defendant will be restrained by order, as prayed in the bill.