## HATCH and another *v.* THE WALLAMET BRIDGE Co.

*(Circuit Court, D. Oregon.  April 21, 1881.)*

1. INJUNCTION.

    A preliminary injunction granted to restrain the erection of a bridge across the Wallamet river, at Portland, contrary to the act of congress (11 St. 383) declaring the navigable waters of the state free and common highways, at the suit of a riparian owner injured thereby.

2. OBSTRUCTION TO NAVIGATION.

    Where congress has declared a navigable river to be a common highway, the state cannot authorize an obstruction therein, and anything which materially interferes with or limits the navigability thereof, considering the use which it is or may be subject to, is an obstruction and a violation of such act of congress, which the United States circuit court has jurisdiction, under the judiciary act of 1875, (18 St. 470,) to prevent or abate by injunction.

In Equity.  Application for preliminary injunction.

*Hugh T. Bingham, Edward Bingham,* and *E. C. Bronaugh,* for plaintiffs.

*H. Y. Thompson, W. Lair Hill,* and *Byron B. Bellinger,* for defendant.

DEADY, D. J.   This application was first heard before me sitting in this court alone, and on April 6th I delivered an opinion thereon, to the effect that the bridge where and as it was being constructed by the defendant was a serious obstruction to the navigation of the Wallamet river, contrary to the act of congress of February 14, 1859, (11 St. 383,) admitting the state into the Union, which declares that all the navigable waters of the state "shall be common highways and forever free" to all the citizens of the United States; and that this court, under section 1 of the act of March 3, 1875, (18 St. 470,) giving it jurisdiction of a suit arising under an act of congress, has authority to restrain parties from violating said act by obstructing the navigation of any of said waters at the suit of any one injured thereby.*   But, considering the importance of the matter to the defendant, I did not then direct the injunction to issue, but continued the application for further hearing, upon the same and such additional evidence as the parties might produce, when the circuit judge, Mr. Justice Sawyer, should be present, and restrained the defendant, as prayed in the bill, in the meantime.   That hearing has been had, and the conclusion reached by his honor, the circuit judge, will now be announced by him. As preliminary thereto, I merely wish to say for myself that the further thorough investigation of this question, and able argument of the case *pro* and *con,* has only deepened my conviction that the proposed bridge is and will be a nuisance and serious impediment to the navigation of this river.

The law of the case upon which the contention mainly turned upon the first hearing is now admitted by the defendant to be correctly stated in the opinion then delivered by myself.

The only remaining question for consideration is, will the erection of this bridge seriously impair or affect the navigability of the river?   If it appears probable that it will, the defendant ought not to be allowed to proceed further in the commission of the wrong.   It has been well said, by some scientific authority upon this subject, that any bridge is a

*See *ante,* 326.

serious obstruction to the navigation of a river which can be essentially improved. Upon the evidence, and in the very nature of things, there can be no doubt that this bridge, where and as it is being constructed, is a serious obstruction to the navigation of the river. It will absolutely obstruct the navigation of the river, except for the space of 100 feet on either side of the pivot pier, and these openings are altogether too narrow to admit the safe and convenient passage of the sea-going vessels that come to this port, or even the larger class of river-boats, except in favorable conditions of wind and water. Indeed, the further investigation of this matter makes it appear very probable to my mind that no bridge, unless it be a suspension one, can be constructed over the river at this point without being a serious obstruction to its navigability, and impairing its usefulness as a common highway for the citizens of the United States.

The Wallamet river in front of Portland is not only a navigable stream with a ship channel: it is also a sea-port,—the harbor, as I have before said, of "the emporium and financial center of the northwest,"—and to all appearance is destined to be second to no city in importance on the Pacific coast save one. Probably nine-tenths of the exports produced west of the Rocky mountains and north of the forty-second parallel are gathered here for sale and shipment abroad upon sea-going vessels of, in some cases, 3,000 tons burden. Every bushel of grain grown for export over this vast region, and particularly in the great Wallamet valley, feels the cost of storage and dockage at this port, and anything which limits or restricts the capacity or convenience of its harbor works a direct injury to the great body of the producers throughout the country. Therefore it is that the convenience of the comparatively small population immediately east of Portland, or even in Portland, is not alone to be considered in this matter. The river is the navigable water of the people of the United States, and the harbor is for the free use of all the people whose exports and imports freight the vessels that frequent it from all parts of the world. At this point, on the west bank of the river, the ox teams of the Wallamet valley first met the sea-going ves-

sel, and the traffic between them was the beginning of Oregon's commerce. Out of this commerce grew the town of Portland. But destroy or materially restrict or impede the free use of this harbor, or the approaches to it, and so far you destroy the town and injure the commerce of the country.

The injunction ought to be allowed.

SAWYER, C. J. I have very little to add to what the district judge has said. I fully concur with him in the conclusions that he has reached. It is very clear that, under the admitted law of the case, the act admitting the state into the union which provides that the navigable waters of the state shall be free and common highways; and in view of the decision of the supreme court in the *Wheeling Bridge Case*, 13 How. 518, in which it was held, under a similar act, that any obstruction to the navigation of the Ohio river was unlawful, except by the consent of congress; and the judiciary act of March 3, 1875, giving this court jurisdiction of a suit arising out of an act of congress,—that this court has authority to restrain the defendant from placing any structure in this river which will obstruct its navigation.

The only remaining question, then, is whether the bridge now being constructed by the defendant will be such an obstruction. To my mind the testimony clearly indicates that the bridge is and will be an unlawful obstruction to navigation. And I think this must be apparent to every person familiar with the subject, or even of general intelligence. If it is at all a material obstruction, it comes within the inhibition of the statute, and is unlawful. It was argued by counsel for the defendant that the commerce of the country is not all carried on up and down or upon the river, and that the commerce and convenience of the people which cross it must be taken into consideration in determining the propriety of bridging it. It may be of importance to the cities upon either bank of the river that they should have communication by means of a bridge; but these are considerations to be addressed to another tribunal than this court. They should be addressed to congress, where, upon an application for per-

mission to bridge the river, these conflicting interests can be considered and adjusted as may be thought best for the public good.

But this court must simply ascertain whether the bridge will be a material obstruction to the navigation of the river. It cannot balance these conflicting interests and determine that the one will be more benefited by the bridge than the other will be injured thereby. Its power is confined to the determination of the question whether it will be a material obstruction to navigation or not.

In the *Wheeling Bridge Case* the obstruction caused by the bridge, as compared with the benefit, was exceedingly small. That suit was commenced in 1849, when the commerce on the Ohio was more limited than now, and the bridge was a connecting link in a great public highway by rail and otherwise. The referee reported that, of all the steam-boats then running on the river, only nine were prevented from passing the bridge on account of the great height—from $63\frac{1}{2}$ to 80 feet—of their "chimneys," and they for only a few days in the year. And although these chimneys might have been shortened or lowered, when passing the bridge, by means of hinges, and although the benefit resulting to navigation in the increased draft given by such tall chimneys must have been small in comparison to the benefit to commerce resulting from the bridge, yet the latter was determined to be a violation of the act of congress declaring the navigation of the river "free and common to the citizens of the United States," and the court ordered it abated as a nuisance. As I said during the hearing, it appears from the evidence that the draw is too narrow to admit the passage of the larger vessels that come here, and on that account the bridge is an obstruction to navigation; and I am satisfied that the further investigation of the subject will make this more apparent. But I am also satisfied that this bridge, whatever the width of the draw, will be an obstruction if erected in the midst of this harbor.

In the course of the argument the question was asked of counsel: Would not even these piers, without a bridge upon

them, standing where they are, be regarded as a nuisance and have to be removed? Now, the fact that you put a bridge upon them does not render them any the less an obstruction, but more so. Located, as it is, right in the midst of the harbor, where vessels are required to move constantly from place to place, without a passage, except at the single point of this draw, the bridge will be a serious obstruction to navigation in the harbor even if the draw was sufficient for the passage of vessels up and down the stream. The act of congress does not limit the free navigation of the river to a particular part or channel, but it declares the whole river a free and common highway to the full extent of its capability of navigation. A bridge may not be a material obstruction to the navigation of a river, if erected at a point where vessels simply pass up and down the channel on their way to and from a port. But, in the case of a harbor like this, the location, surroundings, and circumstances must be considered, and they may require that no part of it be obstructed or closed to navigation. In this view of the matter I think that any bridge in this harbor would necessarily be such an obstruction to its navigation as to require the consent of congress to justify it.

This place is a commercial center—the second port in importance on the Pacific coast—mainly because ocean vessels of a large size can come to its docks. Therefore it is a serious question whether the people of Portland or the state of Oregon can afford to allow a bridge to be built in the midst of this harbor, at a point where ships must congregate, and thereby create such an obstruction therein as may, and probably will, turn the commerce of the city in other channels. This harbor is not large, and when the shipping here is much increased, as it doubtless will be with the growth of the country and the place, there will be no room to spare in it. Ships often remain in the harbor of San Francisco three or four months waiting employment. But they could not afford to incur the expense of lying at the docks all this time. They pay wharfage a few days, while at the docks discharging or taking in cargo, and in the mean time draw out into the

stream, where they can lay without expense. All the navigable waters of this harbor will be needed for the use and accommodation of shipping. In San Francisco, where a large portion of the shipping lies out in the stream, my recollection, from judicial investigation, is that a clear passageway of 600 feet or yards—I think the latter—from the end of the wharves is always kept open, and even then collisions often occur, as the records of the courts there will show.

All these things are to be considered in determining whether it is good policy, even if congress could be brought to consent to it, to bisect this harbor with a bridge that would render it unnavigable along its line, except at a particular point. But when we consider the commerce of the city, the size of the harbor, and the character of the vessels that come to the port, we think the erection of this bridge will prove a great obstruction to the navigation of the river, both on account of the insufficiency of the draw, and, generally considered, as a bridge, and therefore be injurious to the plaintiffs; and, so considering, we feel bound to grant this injunction.

Objection has been made that the plaintiffs have been guilty of delay in applying for this preliminary injunction. There are cases in which such an objection has force, but it does not apply here. This is a matter in which a large number of people are interested, and usually what is everybody's business is nobody's business. It is a large task for any one man to undertake to conduct a litigation against a large company, and it is one he would not undertake unless he was compelled to. It is alleged in the bill, and the evidence shows, that the plaintiffs have actually been compelled to sue, because the owners of vessels have refused to take them to their wharves on account of the danger of passing this construction, even in its present condition, when there is something more than the mere draw to go through; and they may not have been aware of the extent that the bridge would prove an obstruction, until it was so developed and shown. The bill was filed in January, and I think there has been no great delay, the circumstances considered.

Another satisfactory answer to this objection is the fact that, upon the evidence now in the case, or that is ever likely to be, and the knowledge which is open to every one, that in all probability this injunction must be finally sustained. If the injunction is not now issued, and the defendant is allowed to go on and finish the bridge before the final determination of this suit, it would then have to be removed, if the court so adjudged, as it probably would, unless congress, in the mean time, should see fit to authorize it, as it did the Wheeling bridge, which, considering the character of the obstruction, is not at all probable.

The amount of the bond to be given by the plaintiffs I will leave to be settled before the district judge.

DEADY, D. J.   For the convenience of parties, I now say that I think the bond ought to be given in a sum not exceeding $25,000, and that, unless cause is shown to the contrary, the order of the court will be that the injunction issue upon the plaintiffs giving bond in that sum, with sufficient sureties, to be executed before and to the approval of the master of this court, Mr. William B. Gilbert.