## WALLAMET IRON BRIDGE Co. *v.* HATCH and another.

*(Circuit Court, D. Oregon.* March 3, 1884.)

1. BILL OF REVIEW.
   An application to file a bill of review, without the performance of the decree, ought to be made to the court by petition and on notice to the adverse party, and if it appears that the performance of the decree would destroy the subject of the litigation, it ought to be allowed.

2. SAME—HEARING.
   On the hearing of a bill of review the court can only consider the errors of law apparent on the face of the record, and a fact found or determined by the decree is presumed to have been sufficiently proved by the evidence.

3. THE WALLAMET RIVER A NAVIGABLE WATER OF THE UNITED STATES.
   The Wallamet river, though wholly within the state of Oregon, by means of its connection with the Columbia river, forms a highway for interstate and foreign commerce, and is therefore a navigable river of the United States, and subject, as such, to the control of congress.

4. NAVIGABLE WATERS IN OREGON ARE COMMON HIGHWAYS.
   The act of February 14, 1859, (11 St. 383,) admitting Oregon into the Union, which declares that the navigable waters therein shall be "common highways and forever free" to the citizens of the United States, is not a compact made with or condition imposed upon the state in consideration of its admission into the Union, but is, so far, an absolute and valid regulation, made by congress in pursuance of its power over the navigable waters of the United States, as a means of interstate and foreign commerce, which it might as well have enacted before or after as at the time of such admission.

5. OBSTRUCTION TO "COMMON HIGHWAY."
   Congress, by the act of 1859, having declared the Wallamet river "a common highway," the state cannot authorize any one to build a bridge across the same, which, under the circumstances of the case, will needlessly impede or obstruct the navigation thereof.

6. JURISDICTION OF THE UNITED STATES CIRCUIT COURT.
   The Wallamet river being declared "a common highway" by congress, the question of what constitutes a needless and therefore unlawful obstruction thereto arises under a law of the United States, and therefore the United States circuit court has jurisdiction to hear and determine a suit involving the same.

7. THE ORDINANCE OF 1787.
   *Semble,* that the clause in the fourth article of the compact in the ordinance of 1787, concerning the navigable waters of the Northwest territory, was not abrogated or superseded by the formation of states therein and their admission into the Union.

Bill of Review.

*George H. Williams* and *Rufus Mallory,* for plaintiff.

*Walter W. Thayer* and *John M. Gearin,* for defendants.

DEADY, J. This is a bill of review, filed May 27, 1883, and brought to reverse the final decree given in this court on October 22, 1881, in a suit between the parties hereto, commenced by the de-

---

[1]Reversed. See 8 Sup. Ct. Rep. 811.

fendants herein, on January 3, 1881, to obtain an injunction restraining the plaintiff herein from further constructing a bridge across the Wallamet river, at the foot of Morrison street, in Portland, upon the ground that such a bridge as said plaintiff was then engaged in building was an unnecessary and unlawful hindrance and obstruction to the navigation of said river,—particularly with seagoing vessels,—because of the insufficient character and improper position of the piers and the lack of width in the draw; that said bridge would be a public nuisance, injurious, and damaging to the rights and interests of defendants herein, as the owners and lessees of valuable wharf property in Portland, a short distance above the site of said bridge, and contrary to' the act of congress of February 14, 1859, (11 St. 383,) which provides "that all the navigable waters of said state [Oregon] shall be common highways." An application was made to the district judge on the bill, and affidavits, and counter-affidavits for a provisional injunction, and after a hearing, in which the corporation maintained its right to build the bridge in question, under and ,by authority of an act of the legislature of Oregon, of October 18, 1878, authorizing the Portland Bridge Company, a corporation formed under the laws of Oregon, or its assigns, to build a bridge, "for all purposes of travel and commerce," across the Wallamet river, between Portland and East Portland, "at such point or location on the banks of said river" as it might select, "on or above Morrison street, of said city of Portland:" "provided that there shall be placed and maintained in said bridge a good and sufficient draw of not less than 100 feet in the clear, in width, of a passage-way, and so constructed and maintained as not to injuriously impede and obstruct the free navigation of said river, but so as to allow the easy and reasonable passage of vessels through said bridge."

On March 28, 1881, an order was made continuing the application for an injunction until the April term, and until the circuit judge should be present; and restraining the corporation in the mean time as prayed for in the bill. *Hatch* v. *Wallamet I. B. Co.* 7 Sawy. 127; [S. C. 6 FED. REP. 326.] On April 11, 1881, the corporation put in its answer to the bill, alleging that it was a corporation duly formed under the laws of Oregon, and the assignee of the Portland Bridge Company aforesaid; and admitted that it was building the bridge, as alleged, under authority of the act of the legislature aforesaid, except that the draw was 105 feet in the clear, instead of 100, and that the piers were sufficient and at right angles with the current; and denied the same was or would be any hindrance or obstruction to the navigation of the river, or any injury to the defendants herein. At the April term the application for a provisional injunction was further heard upon the bill, answer, and further affidavits and counter affidavits, before the circuit and district judge, the counsel for the plaintiff herein then conceding that the law of the case had been correctly

ruled on the former hearing before the district judge, (*Hatch* v. *Wallamet, I. B. Co., supra,*) and that the only question in the case for the consideration of the court was whether, under the circumstances, the proposed bridge was an unreasonable use of this common highway; and on April 17th an order was made allowing the provisional injunction restraining the corporation, as prayed for in the bill. *Hatch* v. *Wallamet I. B. Co.* 7 Sawy. 141; [S. C. 6 FED. REP. 781.] Subsequently, the cause was put at issue by the filing of a replication to the answer, and testimony taken by both parties, and at the October term it was finally heard before the circuit judge, who, on October 22, 1881, gave a decree therein for the defendants herein, perpetually enjoining the corporation as prayed for in the bill, and also requiring it to remove the material already placed in the river in the construction of the piers. From this decree an appeal was allowed to the plaintiff herein on October 22, 1883.

An application was made for leave to file the bill of review, without first performing the decree requiring plaintiff therein to remove the unfinished piers from the river. The application was based upon a petition or allegation in the bill, stating the grounds thereof. Upon notice to the adverse party it was heard and allowed upon the ground that the performance of the decree, in this respect, would involve large expense and the destruction, so far, of the subject of the litigation, so that if the decree is reversed for error, the plaintiff herein will, nevertheless, suffer an irremediable loss, as in the case of the cancellation of a bond in obedience to a decree. Story Eq. Pl. § 406; *Davis* v. *Speiden,* 104 U. S. 83. But I think the better method of making the application is by a separate petition for that purpose, against which the adverse party may show cause and the matter be fully heard and determined thereon. The right to file the bill may depend upon a question of fact not determined or affected by the proceedings or decree in the case, as the pecuniary ability of the party to pay a given sum of money, and therefore the application should be made in such manner as will best enable the parties to be fully heard in the premises. The rule requiring the performance of the decree is said to be "administrative" rather than "jurisdictional," and therefore a bill filed without such performance or leave would give the court jurisdiction to review the decree; and if the adverse party did not move to strike it from the files, he would be held to have waived the objection. *Davis* v. *Speiden, supra,* 85.

The defendants herein demur to the bill, for that there are no errors in the record, nor any sufficient matter alleged in the same, to require a reversal of the decree. The bill contains an assignment of errors, 11 in number, most of which are predicated upon the reasons given in the opinion of the court allowing the provisional injunction, rather than the decree itself, and all but one are simply variations of the allegation that the court erred in deciding that the act of congress of February 14, 1859, was in any degree a limitation or re-

straint upon the power of the state to obstruct or authorize the obstruction of the navigation of the river, by the construction of a bridge of any character across the same. The exception is the assignment No. 4, which alleges that the court erred in deciding as a matter of fact that the bridge in question is or will be a nuisance and serious impediment to the navigation of the river. This is a proceeding to review the former determination of this case and obtain a reversal of the decree then given therein for errors of law apparent on the face of the record,—the pleadings, proceedings, and decree,— without reference to the evidence in the case. Story, Eq. Pl. § 407; *Shelton* v. *Vankleeck*, 106 U. S. 532; [S. C. 1 Sup. Ct. Rep. 491.] No question is made but that the allegations of the original bill are sufficient to authorize the decree; and the law presumes that the evidence was sufficient to sustain it. It follows, then, that for the purpose of this proceeding it must be considered settled that this bridge, as and where it was being built, is and would be, as a matter of fact, a serious and unnecessary impediment and obstruction to the navigation of the river, by reason of which the defendants herein suffered and would suffer, as riparian proprietors, special damage. But whether such obstruction is also unlawful is the question, and the only one, properly arising on this bill of review. The assignment of errors in law, as has been stated, are in effect that the act of 1859 has no application to the case; that congress has made no provision on the subject of the navigation of the river; and that therefore the whole question of the lawfulness of the proposed structure arises under the state law, and is without the jurisdiction of this court.

The argument of counsel for the corporation, in support of this conclusion, is, in substance and effect:

(1) The Wallamet river is wholly within the state of Oregon, and therefore not within the power of congress to regulate or conserve its use as a vehicle, or means of interstate or foreign commerce. Now, this proposition has no countenance or support in either reason or authority. In fact, and for all the purposes of commerce, the Wallamet river is a part of the Columbia, of which it is an important affluent or branch. Together they form, or help to form, a continuous highway between Oregon and the other Pacific states and territories and foreign countries; therefore, in contemplation of the constitutional grant of power to congress over the subject of commerce between these states and countries, and for the purpose of regulating the same, it is the property of the nation—a navigable water of the United States. The authorities from *Gibbons* v. *Ogden*, 9 Wheat. 1, to *Miller* v. *City of New York*, 3 Sup. Ct. Rep. 234—a period of 60 years—are uniform and unqualified on this point.

In *Gilman* v. *Philadelphia*, 3 Wall. 724, Mr. Justice SWAYNE says:

"Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than

those in which they lie.   For this purpose they are the public property of the nation, and subject to all the requisite legislation by congress.   This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the states or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against occurrence of the evil, and for the punishment of the offenders."

In *The Daniel Ball,* 10 Wall. 557, it was held that Grand river, a comparatively insignificant water lying wholly within the state of Michigan, but emptying into the lake of that name, and only navigable 40 miles from its mouth to Grand Rapids, for a boat of 123 tons burden, is a navigable water of the United States, and subject to its control as a highway of commerce, interstate and foreign, on account of its junction with Lake Michigan, of which it forms a part.   In delivering the opinion of the court, Mr. Justice FIELD said (page 563) the common-law test of the navigability of a river—the ebb and flow of the tide therein—does not apply to the rivers of this country:

"Those rivers must be regarded as public, navigable rivers in law which are navigable in fact; and they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and they constitute navigable waters of the United States within the meaning of the acts of congress, in contradistinction from the navigable waters of the states, when they form in their ordinary condition, by themselves or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water."

In *Escanaba Co.* v. *Chicago,* 107 U. S. 678, [2 Sup. Ct. Rep. 185,] it was held that the Chicago river, lying wholly within the city of Chicago, and a little local stream, compared with the Wallamet, is a navigable water of the United States, because it leads into Lake Michigan; and in *Miller* v. *City of New York, supra,* the same rule was applied to the East river, a water wholly within the state of New York, but connecting the Hudson and the sound, and therefore a highway of interstate and foreign commerce.   Mr. Justice FIELD delivered the opinion of the court in both these cases, and referred to and relied on the above citation from the opinion of the court in the case of *The Daniel Bell.*   See, also, *Hatch* v. *Wallamet I. B. Co., supra.*

(2) That if congress has the power to regulate the navigation of the Wallamet river, as a navigable water of the United States, it cannot do so by a special act, as the statute of 1850, applicable alone to the waters of Oregon, but only by a general law, which shall operate uniformly upon all such waters in the United States.   And this proposition is also without a shadow of foundation in either reason or authority.   It is rather late in the day to question the right of congress to exercise its authority over the navigable waters of the United States, specially,—from time to time and place to place,—as

it may consider the exigencies of commerce to require. Congress has been making appropriations from time to time, for years, to maintain and improve the navigation of the Wallamet river, but on this theory of its power all such acts are void and usurpations of power, unless a like provision was made at the same time for every other navigable water of the United States. In the last 15 or 20 years congress has legislated largely on the subject of bridges over the Ohio, Mississippi, and Missouri rivers, prescribing when, where, and how they may or may not be built, (*Hatch v. Wallamet I. B. Co., supra ;*) and although important interests have been unfavorably affected by such legislation, it was never before suggested that it was invalid for want of such uniformity. It has also legislated specially upon the subject of a bridge over the East river in New York; and although the legality of this structure has since been contested from the circuit to the supreme court of the United States, (*Miller v. City of New York, supra,*) no one appears to have ever questioned the legality of the act of congress authorizing its erection and prescribing its character and location, on this or any other ground.

The vice of the argument in support of each of these propositions is the assumption that the navigable waters within a state are exclusively the waters of such state, and therefore congress has no power over them; or, if it may legislate concerning them in the interest of commerce, it can only do so by such general legislation as shall limit or affect the power of each state in the premises equally, so as to preserve, as it is said, its "equal footing in the Union with the other states." But, as we have seen, this theory of the matter is founded upon a total misapprehension of the relation of the national and state governments to the subject and to one another. For the purposes of commerce, and the exercise of the power of congress over that subject, every navigable water in the Union which of itself, or by means of its connections, forms a continuous highway for interstate or foreign commerce, is primarily the navigable water of the United States, over which it has the same power for the purposes of such commerce as if it was wholly in a territory or the District of Columbia. When and how far congress will exercise this power is a question for its determination in each case, looking to the public convenience and general welfare. In the exercise of this, as in the case of other congressional powers, no such thing as uniformity of action is desirable or attainable; and it is also to be considered that what is lawful may not always be expedient.

(3) That congress has no power, in the admission of a state into the Union, to impose, by compact or otherwise, any limitation or restriction on its powers or rights as a state, under the constitution; and therefore the act of 1859, admitting Oregon into the Union, so far as it attempts to restrict its power over the navigable waters within its limits, is void and of no effect. But admitting the premises, the conclusion does not follow. Although the grant of power to

congress to admit new states into this Union (U. S. Const. art. 4, § 3) is unqualified, yet it is well established by the supreme court that congress cannot admit a state upon any other than an equal footing with the other states therein, and therefore cannot, as a consideration of such admission, make any valid compact or enactment which shall deny to such state within its limits the municipal powers common to the others. *Pollard* v. *Hagan*, 3 How. 233; *Permoli* v. *New Orleans*, Id. 609; *Strader* v. *Graham*, 10 How. 92. The act of 1859, admitting Oregon into the Union, contains (section 4) four propositions to the people of Oregon concerning the public lands therein, which, in consideration of a valuable grant of public land, they accepted by an act of the legislature of June 3, 1859. Or. Laws, 101. But the admission of the state was not conditioned upon the acceptance of these propositions, and in fact preceded it. Nor did the state, in accepting it, undertake to relinquish any power or right that belonged to it, as a state of the Union, unless it is the right to tax "nonresident proprietors" higher than "residents." Therefore, this portion of the act is valid, without reference to such acceptance, as a congressional enactment respecting the disposition of the public lands in Oregon. U. S. Const. art. 4, § 3; *Pollard* v *Hagan*, 3 How. 224.

But the clause in section 2 of the act of 1859, declaring the navigable waters in Oregon to be "common highways," is no part of these propositions, and does not even purport to derive its force or vitality from this or any compact, but solely from the fact that it is an act of congress, duly passed by it in pursuance of its power to regulate commerce. The admission of the state and the enactment of the regulation are simply coincident in point of time. The one was admitted unconditionally and the other enacted absolutely; and the regulation might have been enacted on the day before or the day after the admission, or at any time since as well as then. But even if it had been made a condition of the admission of the state into the Union that the people thereof should consent to this regulation, it would nevertheless be valid, as an act of congress, because that body had the power to pass it without their consent. Their consent would add nothing to its force or validity. In the leading case on this subject of *Pollard* v. *Hagan, supra,* the court say (page 229) of the following declaration contained in the compact entered into between the United States and Alabama, upon the admission of the latter into the Union, "that all navigable waters within the said state shall forever remain public highways, free to the citizens of said state and the United States, without any tax, duty, impost, or toll therefor, imposed by the said state," (3 St. 492,) that it was nothing more than a regulation of commerce, and, as such, a valid and binding act of congress, without reference to the supposed compact or the consent of the people of Alabama.

(4) That the provision in section 2 of the act of 1859—"all the navigable waters of said state [Oregon] shall be common highways

and forever free, as well to the inhabitants of said state as to all other citizens of the United States, without any tax, duty, impost, or toll therefor"—was not intended, and should not be construed as a restriction or limitation on the power of the state to impede and obstruct the navigation of the Wallamet river at its pleasure, but only on its power to impose a toll upon any citizen of the United States on account of such navigation. This clause had its origin in the fourth of the articles of compact of the ordinance of 1787, for the government of the Northwest territory, in which it was provided that "the navigable waters leading into the Mississippi and the St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost or duty therefor;" and has been applied to the states admitted to the Union since the formation of the constitution, and formed out of territory other than that included in the ordinance, it being generally supposed, until a comparatively late day, that these articles of compact, and particularly the clause in question, continued in force in the states formed out of such territory, except so far as altered by "common consent." *Strader* v. *Graham*, 10 How. 97, McLean and Caton, JJ.; *Palmer* v. *Com'rs Cuyahoga Co.* 3 McLean, 226; *Columbus Ins. Co.* v. *Curtenius*, 6 McLean, 209. It is admitted that the provision does prohibit this state from imposing any tax or toll on any citizen of the United States on account of the navigation of the river. But the authority of the national government to restrain the state in this particular is no clearer than it is to prevent the state from authorizing or causing obstructions to the navigation of the river that may as effectually deprive the citizen of the United States of its use as a highway as any tax or toll could.

Counsel for the plaintiff herein contend that the words "common highways forever free," taken in connection with the rest of the sentence, show that the paramount purpose of this legislation "was to prevent any discrimination between the citizens of the United States," in the imposition of tolls on account of the navigation of the river. But there is no ground for this construction, for plainly the clause does not rest with the prohibition of discrimination in the imposition of such tolls, but goes further, and prohibits them altogether, as well in the case of the citizens of the state as of the United States. But the clause contains two distinct provisions—the one an absolute prohibition against the imposition of tolls for the navigation of the river, and the other a declaration that the river shall remain a "common highway" for the use of all the citizens of the United States. The two things are separate and distinct, and one is not to be considered the mere adjunct or amplification of the other, because it is found in the same sentence. The maxim, *noscitur a sociis*, does not apply. And if either provision can be considered as subordinate to the other, it is

the one against tolls. A highway is a public way upon which all persons have a right to pass; and a public river is such a way, since it is open to all the king's subjects. Rap. & Law, Law Dict., "Highway;" 2 Smith, Lead. Cas. 175.

A declaration or act of the congress of the United States that a navigable water thereof shall be a "common highway," imports, *ex vi termini,* that such water shall not be closed up or obstructed by dams, booms, bridges, or otherwise, so as to materially impede or hinder the navigation of the same. And being a highway, no toll can be charged for travel thereon, except by consent of the sovereign power which declared and made it such,—the congress of the United States,—and they have been forbidden it to be done. The plain purport and effect of the statute is this: (1) The Wallamet river is declared and made a "common highway" for the use of all the citizens of the United States; and (2) it shall be a "free" highway, upon which no toll, tax, or impost shall be charged. Being a "common" highway, it is open to all citizens; and being also "free," it is open to them without toll or tax. From these premises, the conclusion follows that any obstruction to the navigation of this river, which materially impairs its use as a "common highway," is contrary to the act of congress, and therefore illegal, whether authorized by the legislature of the state or not. It also follows that a case involving the question whether any bridge or other structure is such an obstruction, is a case arising under a law of the United States, and therefore within the jurisdiction of this court. Act of 1875, (18 St. 470.) The court then had jurisdiction to hear and decide the question whether this bridge is or would be such an obstruction to the use of this highway as is forbidden by the act of congress. Whether it properly decided the question or not is a matter depending upon the circumstances of the case as disclosed by the evidence, and cannot be considered in this proceeding. The way to determine that is by an appeal from the final decree in the original case to the supreme court, where the whole question can be considered on its merits. And in this connection it should be remembered that the court did not decide that the act of 1859 prohibited the erection of *any* bridge across the Wallamet. It prohibits, of course, the erection of a low, solid bridge, for that would be an impassable barrier—a complete closing of the highway. And it is equally certain that it does not prohibit the erection of a high, suspension bridge under which vessels navigating the river might pass without hinderance or delay. Neither does it prohibit a low bridge, properly constructed with a good and sufficient draw, through which vessels may pass without unnecessary danger or delay—the commerce, size, and condition of the river, as well as the state of the art of such bridge building being taken into consideration. It is well known that all highways, whether of land or water, are subject to be crossed by other highways. The commerce of the country cannot be conducted on parallel lines. But where and in what manner such crossing shall

be made or allowed depends largely upon the particular circumstances of each case. *Hatch* v. *Wallamet I. B. Co., supra.*

But the court found upon the evidence that, all the circumstances considered, the draw of the proposed bridge was altogether inadequate; that it ought to be at least 150 feet wide on either side of the pivot pier, as provided in the act of congress of June 23, 1874, (18 St. 281,) authorizing the Oregon & California Railway Company to bridge the river at this place; and therefore it was a material as well as needless obstruction to the navigation of the river, causing danger and delay to the passage of vessels thereon. Neither did the court hold that such a bridge was even authorized by the act of the legislature of October 18, 1878. That act requires not only that the bridge shall have a draw of not less than 100 feet in width, but that it shall be "so constructed and maintained as not to injuriously impede and obstruct the free navigation of said river, but so as to allow the easy and reasonable passage of said vessels through said bridge.

Upon this point the conclusion of the court was that the legislature did not intend to declare that a draw of only 100 feet in width is sufficient, or to authorize the construction of a bridge otherwise than with a draw sufficient for the easy and safe passage of vessels, whether that must be one or two hundred feet in width, but that if it did, the act was invalid, because contrary to the act of congress, which on this point is the supreme law of the land. *Hatch* v. *Wallamet I. B. Co., supra.*

And in this connection the court is reminded by counsel for the plaintiff herein "that it is a delicate duty for a court to declare an act of the legislature invalid." Of course, the court will not do so unless the conflict between it and the act of congress is plain. And for this reason the act of the legislature is to be construed, if it reasonably can, so as to prevent such conflict, and make it harmonize with supreme law. But really it is well to remember, in a case like this, that the interested parties who prepare and procure the passage of an act granting themselves some special privilege or franchise like this are more responsible for it than the members of the legislature. The average member, having no special interest in the matter, and knowing little, if anything, about it, but seeing that the act contains a plain provision that the bridge shall be built with a good and sufficient draw anyhow, with that understanding gives his consent to its passage; and I think it ought to be so construed by the court. Considered in this, its true light, the act is only a license to the corporation named therein, or its assigns, to build a draw-bridge at this point, subject to the act of congress of 1859; or, in other words, so as not needlessly to impede or obstruct the navigation of the river, considered as a "common highway." Beyond this the legislature could not go, and it is not to be presumed that it so intended.

The decision in *Escanaba Co.* v. *Chicago, supra,* so much relied on by the plaintiff herein, is not in conflict with these views. In a legal

point of view, the case is not new, though it contains some wholesome suggestions upon the application of the law to the facts and circumstances of that case, which are peculiar and altogether different from this.   A small bayou, called a river, with a current less than a mile an hour, not a mile in length below its two branches, not exceeding two miles in length each, not naturally over 150 feet in width, and lying in the heart of a great city, was deepened and widened so as to serve as a canal or convenient water-way, whereon to move the lake boats from the harbor in the lake outside, into which it drained, to the docks and warehouses along its banks.   Over it there are a number of drawbridges, erected by public authority, on which pass daily great numbers of people, particularly in going to and returning from their business and employment in the morning and evening.   Amer. Cyclo. Chicago.   The city, by the authority of the state, and with a view of preventing the inconvenience resulting from the unregulated and conflicting use of the bridges and the water-way, passed an ordinance requiring the draws to be closed for the benefit of the land travel for one hour in the morning and evening, and limiting the period during which a draw might be kept open for the passage of vessels to 10 minutes at any one time.   The suit did not involve the right to build the bridges, nor the sufficiency of the draws.   The right of the city on both these points was taken for granted, and the only question made and decided was whether, under the circumstances, this was a reasonable regulation, one that did not needlessly obstruct the use of the water-way, and the court, if I may be allowed to say so, very properly and wisely held that it was.   The case was brought in the circuit court of the United States upon the assumption that the provision of the fourth article of compact of the ordinance of 1787, whereby the navigable waters of the Northwest territory were declared "common highways" was still in force in Illinois, and therefore the reasonableness of the city ordinance, when judged by this United States law, was a federal question, and the national courts had jurisdiction of the case, and the decision was actually made upon this hypothesis. But the learned justice who delivered the opinion of the court went further, and said that by the admission of Illinois into the Union "on an equal footing with the original states in all respects whatever," the ordinance ceased to have any effect within her limits, and therefore there was no law of the United States regulating the use of the navigable waters of the United States within the state of Illinois, and therefore the latter was the judge of what was reasonable in the premises.

The cases cited in support of this latter conclusion are *Pollard* v. *Hagan,* 3 How. 212; *Permoli* v. *New Orleans,* Id. 589; and *Strader* v. *Graham,* 10 How. 82.   By the first one, as we have seen, it was simply held that congress cannot, by any compact or condition made with or laid upon a state on her admission into the Union, restrain or limit her municipal power as such state, but that, if the subject of

the compact or condition is within the power of congress to enact or regulate, without the consent of the state,—as to declare that the navigable waters therein shall be "common highways,"—it is good as a law. In *Permoli's Case* the court only held that so much of the articles of compact as secured religious freedom to the inhabitants of the territory of Orleans—the same having been specially extended there by congress—ceased to have any force or effect therein upon the admission of the territory into the Union as the state of Louisiana, because the subject of religious freedom in a state was beyond the power of congress, and exclusively within that of the state. In *Strader's Case* it was decided on a writ of error to the supreme court of Kentucky that the condition of a negro held as a slave in that state, and who had been allowed to visit Ohio, but afterwards returned, was, after such return and in said state, a question arising solely under the laws of Kentucky, and therefore not within the jurisdiction of the supreme court. But, in delivering the opinion of the court, Mr. Chief Justice TANEY, referring to some sort of claim that had been made in the argument that the provision in the articles of compact of the ordinance of 1787, prohibiting slavery in the Northwest territory, of which Ohio was a part, had some bearing on the question of the *status* of the negro, denied that it could have any effect outside of such territory; and then took occasion further to say that the ordinance was no longer in force, even in Ohio, where it had been superseded by the organization and admission of the territory into the Union as a state, and added that it had been so decided in the cases of *Permoli* v. *New Orleans* and *Pollard* v. *Hagan, supra.* But this statement, though true generally, and in the light in which the chief justice was considering the articles—that is, so far as they trenched upon the municipal power of the state, or were inconsistent with its control over its domestic affairs,—was not otherwise accurate or correct. And for this reason both Justices McLEAN and CATRON, while assenting to the decision that the ordinance had no application to the case, in any view of the matter, and that the court had no jurisdiction to review the judgment of the Kentucky court, protested against this *dictum* of the chief justice, the latter putting his dissent especially on the navigation clause of the fourth article of the compact, and saying:

"For thirty years, the state courts within the territory ceded by Virginia have held this part of the fourth article to be in force and binding on them respectively; and I feel unwilling to disturb this wholesome course of decision, which is so conservative of the rights of others, in a case where the fourth article is nowise involved, and when our opinion might be disregarded by the state courts as *obiter* and a *dictum* uncalled for."

And as we have seen, the only question decided in *Permoli's Case* was that the clause in the compact securing religious freedom to the inhabitants of the territory was necessarily superseded upon its admission into the Union as a state, while it is admitted that the principle

of this ruling would include all similar provisions in the compact. In *Pollard* v. *Hagan,* while it was held that a state could not be hampered or bound, in its admission into the Union, with conditions or compacts that would limit or restrain its municipal power and right, as compared with the other states therein, it was distinctly decided that the clause in the ordinance, as applied to Alabama by the act of congress of March 2, 1819, (3 St. 489,) authorizing the people of that territory to form a constitution, declaring the navigable waters of the future state "common highways," was not such a condition, but a valid law which congress had the power to enact, whether the waters were within a state or territory.

I, therefore, respectfully submit that the clause in the fourth article of the compact in the ordinance of 1787, relating to the navigable waters in the Northwest territory, having been enacted by congress, (1 St. 50,) was a valid commercial regulation as to the navigable waters in said territory or the states afterwards formed therein until repealed by it, and therefore it is still in force in Illinois. But be this as it may, the decision does not touch the question of the validity or force and effect of the act of 1859. For on what possible ground can it be claimed that the admission of Oregon into the Union set aside or superseded an otherwise valid clause in the very act of admission, declaring the navigable waters of the future state "common highways?"

This case, having been heard before the circuit judge, and the decree under review having been made by him, I thought I ought not to decide the matter without consulting him. Accordingly, I submitted this opinion to Judge SAWYER, with copies of the briefs of counsel, and he has authorized me to say that he concurs in it.

There being, then, no error in the original decree, as it appears to this court, the demurrer to the bill of review must be sustained, and the bill dismissed, and it is so ordered.