## HUGHES *v.* NORTHERN PAC. RY. Co. and others.

*(Circuit Court, D. Oregon. October 29, 1883.)*

1. **VERIFICATION OF BILL IN EQUITY.**
    A bill in equity, even for an injunction, need not be verified unless it is intended to be used as evidence on an application for a provisional injunction.

2. **JURISDICTION UNDER A LAW OF THE UNITED STATES.**
    A suit arises under a law of the United States when the controversy involved therein turns upon the existence, effect, or operation of such a law, and therefore a suit by a riparian owner to enjoin the construction of a bridge contiguous and injurious to his property, upon the ground that the defendant is not authorized to build the same by a certain act of congress, as it pretends and claims, arises under said act, and is within the jurisdiction of the proper circuit court.

3. **IN WHAT COURTS THE NORTHERN PACIFIC MAY SUE OR BE SUED — CITIZENSHIP OF.**
    *Semble*, that the Northern Pacific Railway Company, being created by an act of congress, may sue or be sued in the proper circuit court of the United States in all cases; and, *quære*, of what state, if any, is it a citizen, for the purpose of jurisdiction in such courts?

4. **ACT INCORPORATING THE NORTHERN PACIFIC — CONSTRUCTION OF.**
    The act of July 2, 1864, (13 St. 365,) incorporating the Northern Pacific Railway Company, and the acts amendatory thereof, are a grant by the public to a private corporation, and must therefore be construed most strictly against the latter, so that no authority, right, or privilege can be held to pass thereby unless the same is therein plainly expressed or clearly implied.

5. **NORTHERN PACIFIC AUTHORIZED TO BRIDGE A NAVIGABLE WATER ON THE LINE OF ITS ROAD.**
    The Northern Pacific Railway Company was authorized by said acts "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railway" from Lake Superior to Portland, Oregon, "with all the powers, privileges, and immunities necessary to carry into effect the purpose" of said acts; the same "to be constructed in a substantial and workmanlike manner, with all the necessary draws, * * * bridges, etc., * * * equal in all respects to railways of the first class;" and it is necessary to cross the Wallamet river with such road in order to reach Portland from the eastward. *Held*, that the right of the Northern Pacific Railway Company to build and maintain a draw-bridge across said river, or other navigable water on the line of its road to Portland, without causing any unnecessary injury or obstruction to the usefulness thereof, is clearly implied in said acts; but that congress not having prescribed the exact location or particular character of said bridge, the right of the corporation to construct it is subject to the judgment of the proper court as to whether it is being constructed without unnecessary injury to the navigability of such water, upon the complaint of any one specially injured thereby, or likely to be.

6. FORFEITURE OF CORPORATE RIGHTS.

The legislature may provide that a corporation shall cease to exist, or forfeit a particular right or privilege, unless it does certain things within a given time, and in case of such failure the prescribed consequence will follow of course, without the intervention of a court, or any proceeding to declare or establish the same; but the provisions in the acts aforesaid, to the effect that the grants thereby made to the Northern Pacific Railway Company are made upon the condition that the road will be completed within a certain time, have no such effect, but are simply conditions subsequent, without any special consequence prescribed for a breach of them, and therefore no one can complain of any such breach, or take advantage of it, except the government of the United States; and it only, as declared in the act, for the purpose of securing "a speedy completion of the said road."

In Equity.

*George H. Williams* and the plaintiff in person, for plaintiff.

*Joseph N. Dolph* and *Cyrus A. Dolph*, for defendants.

DEADY, J. The plaintiff brings this suit to enjoin the defendants, or any of them, from building a bridge across the Wallamet river at the north end of Portland. The bill alleges that the plaintiff is the owner of the river blocks numbered 11, 12, and 13, and the south half of 14, in Watson's addition to Portland, lying on the west bank of the Wallamet river, between North Front street and said river, with the usual right of wharfage and dockage in front thereof; that the port of Portland is a sea-port, where sea-going vessels enter, and that said river is navigable above and to the southward of said property for such vessels for the distance of two miles; "that the defendants, or some one or more of them, are now engaged in and threaten to continue the construction of a bridge across said river within the limits of the port of Portland, and down the stream from and to the north of said property, and to maintain and to operate the same when built; and that said bridge, if constructed and maintained, will be a great and lasting obstruction to the use of the Wallamet river to the south and up the stream of said river from said bridge for the passage of boats, ships, and vessels to the wharf property there situate, and will thereby greatly and in a lasting manner damage all the wharf property situate up the stream of said river from and to the south of said bridge, and therewith will work a great and lasting damage to the property aforesaid, and also constitute a great and lasting obstruction and hindrance to the commerce of the port of Portland;" that said property has no wharf upon it at present, but may be used for such purpose, "and is of great value therefor;" that the several defendants, through "separate corporations," are all under the control of the same persons, so that plaintiff is unable to determine which of them is in fact engaged in constructing said bridge, or proposes to maintain and operate the same; that the said persons claim that "some one or more of said defendant corporations" are authorized by the state of Oregon and the United States to build and maintain the said bridge, but that neither of said defendants has any "such power or authority at this time," nor has the state consented

to the construction of the proposed bridge, or the secretary of war approved of the location thereof.

The cause was argued and submitted on a demurrer to the bill by each of the defendants. The grounds of the several demurrers are substantially these: (1) The bill is not verified; (2) the bill is without equity, and the plaintiff is not entitled thereon to an injunction; and (3) the court has no jurisdiction of the subject-matter or the parties to the suit.

On the argument it was admitted by the counsel for the defendants, that the bridge was being built by the Northern Pacific Railway Company alone, under the act of congress of July 2, 1864, (13 St. 365,) and the acts amendatory thereof, and the act of the legislative assembly of the state of Oregon of October 28, 1874. Sess. Laws, 101. This being so, it would have been proper for the other defendants to have answered and denied or disclaimed any interest or participation in the structure or controversy.

However, the case will be considered by the court as it was argued by counsel, upon the theory that the controversy is now one between the plaintiff and the Northern Pacific Railway only.

By the first section of the act of July 2d, aforesaid, entitled "An act granting lands to aid in the construction of a railway and a telegraph line from Lake Superior to Puget sound, on the Pacific coast, by the northern route," congress provided that the persons therein named, and others who might be associated with them, should constitute a corporation by the name of the Northern Pacific Railway Company, with power and authority, among other things,—

" To lay out, locate, construct, furnish, maintain, and enjoy a continuous railway and telegraph line, with appurtenances, namely, beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin; thence westerly by the most eligible railway route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget sound, with a branch via the valley of the Columbia river *to a point at or near Portland*, in the state of Oregon, leaving the main trunk line at the most suitable place, not more than 300 miles from the western terminus."

—And it was also declared by said section that said company "is hereby vested with all the powers, privileges, and immunities necessary to carry into effect the purposes of this act as herein set forth."

By sections 2 and 3 of the act the company is granted the right of way through the public lands, and certain odd-numbered sections thereof, on either side of said way, for the purpose of aiding in the construction of its road.

Section 5 provides—

" That said Northern Pacific Railway shall be constructed in a substantial and workmanlike manner, with all the necessary draws, culverts, *bridges*, viaducts, crossings, turn-outs, stations, and watering places, and all other appurtenances, including furniture and rolling stock, equal in all respects to railways of the first class, when prepared for business, with rails of the best quality, manufactured from the best iron."

The act further provides that the company is authorized, within certain limits, "to enter upon, purchase, take, and hold any lands or premises that may be necessary and proper for the construction and working of said road," and prescribes a mode of ascertaining the value thereof, in case the owner and the company cannot agree thereabout (section 7;) that "each and every grant, right, and privilege" thereby made to the company is made upon the condition that the road shall be completed by July 4, 1876, (section 8;) that the road "shall be a post-route and military road, subject to the use of the United States" for all government service, (section 11;) and that the company "shall obtain the consent of the legislature of any state through which any portion of said railway may pass previous to commencing the construction thereof."

This consent was obtained from the state of Oregon by the act of October 28, 1874, *supra*, which provides—

"That the consent of this state be and is hereby given to the Northern Pacific Railway Company, a corporation chartered by an act of the congress of the United States, approved July 2, 1864. to construct its road and telegraph line, or any portions of the same, within the boundaries of this state, and to enjoy, within said boundaries, the rights and privileges which said corporation has, or may have, under the laws of the United States, by virtue of said act of congress, and the amendments thereto."

Subsequently, congress extended the time for the completion of the road to July 4, 1878. See act of May 7, 1866, (14 St. 435,) and of July 1, 1868, (15 St. 255.)

By the joint resolution of April 10, 1869, (16 St. 57,) the company was authorized "to extend its branch line from a point at or near Portland, Oregon, to some suitable point on Puget sound, to be determined by said company, and also to connect the same with its main line west of the Cascade mountains, in the territory of Washington; said extension being subject to all the conditions and provisions, and said company in respect thereto being entitled to all the rights and privileges, conferred by the act incorporating said company, and all acts additional or amendatory thereof;" and by that of May 31, 1870, (16 St. 378,) it was further authorized "to locate and construct, under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its main road to some point on Puget sound, via the valley of the Columbia river, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade mountains to Puget sound;" and required to complete 25 miles of said main line between Portland and the sound by January 1, 1872, and 40 miles a year thereafter until it was completed between said points. By this summary it appears that the Northern Pacific Railroad is authorized, since May 31, 1870, to construct its "main line" down the Columbia river, and via Portland, instead of across the Cascade mountains to the sound, and thus make the former place the practical western terminus of the

road, with an extension or branch northward to some point on the latter; and what has been done in this respect is a matter of such common notoriety that the court may take judicial notice of it.

The company has constructed its main line from the eastern terminus to the Wallula junction,—a point 214 miles east of Portland, —where it connects with the road of the Oregon Railway & Navigation Company, extending from Portland, up the Columbia river, to said junction, and is operated in connection therewith, as one road, from the latter place to St. Paul. Its extension northward has also been constructed from Portland to Tacoma, on the sound, a distance of 143 miles, thus making a continuous line of road from Lake Superior to tide-water on the Pacific.

The objection that the bill is not verified is immaterial. A bill in equity is not required to be sworn to, unless it is sought to be used as evidence upon an application for a provisional injunction or the like.

The first question to be considered is, has the court jurisdiction of this suit? The defendant, by its demurrer, raises the question of jurisdiction, but did not press it upon the argument.

By section 1 of the act of March 3, 1875, (18 St. 470,) jurisdiction is conferred on this court of a suit in equity arising under a law of the United States. The bill alleges that the defendant claims the right to construct the bridge in question by authority of an act of congress and of the state, but denies that it is so authorized. A controversy, which turns upon the existence, effect, or operation of an act of congress, arises under such an act, and a suit brought to determine the same is a case arising under such act within the meaning of the statute.

On the argument counsel for the defendant insisted that it was authorized to build the bridge by the act of its incorporation, in connection with the act of the state consenting thereto. This, coupled with the denial of such authority by the plaintiff, is an admission that the court has jurisdiction of the suit on account of the subject-matter. The defendant claims the right to build a bridge across the Wallamet river under a law of the United States, which right the plaintiff denies, and this suit, which is brought to determine this claim, is necessarily a suit arising under such law of the United States. *Hatch* v. *Wallamet Iron Bridge Co.* 7 Sawy. 131; [S. C. 6 Fed. Rep. 326, 780;] *Bybee* v. *Hawkett,* 6 Sawy. 598; [S. C. 5 Fed. Rep. 1.]

There is no controversy in the case arising under the law of the state. The state has not given the defendant any absolute right to construct a railway or bridge within its limits, but only consented that it may do in this respect whatever it is authorized to do by the act of its incorporation. So that the only question in the case is, has congress, by the act of July 2, 1864, empowered the defendant to construct a railway bridge across the Wallamet at this point? If it

has, the plaintiff admits that this suit cannot be maintained; and if it has not, it is equally clear that the defendant, in attempting it, is guilty of a nuisance to the special injury of the plaintiff, and therefore ought to be restrained from so doing.

There is also involved in this suit the effect to be given to the clause in section 2 of the act of February 14, 1859, (11 St. 383,) providing for the admission of the state into the Union, which declares that "all the navigable waters of said state shall be common highways" to all citizens of the United States. In effect, this statute prohibits the erection of any bridge across the Wallamet river, unless it be one so far above the stream as not to interfere in any degree with its navigation, without the consent of the United States, even if authorized by the state. *Wheeling Bridge Case*, 18 How. 431; *Hatch* v. *Wallamet Iron Bridge Co*. 7 Sawy. 135; [S. C. 6 FED. REP. 326, 780.] The question whether the proposed bridge is contrary to or in conflict with the injunction of this statute is a national one, and a suit to determine it arises under a law of the United States, and is, therefore, within the jurisdiction of this court. *Osborn* v. *Bank of U. S*. 9 Wheat. 816; *Hatch* v. *Wallamet Iron Bridge Co., supra*.

Whether the court also has jurisdiction of the suit on account of the citizenship of the parties, it is not now necessary to determine. The plaintiff is a citizen of Oregon, and it is assumed by the demurrer that the defendant is also. But the *status* of the defendant in this respect is not settled by any adjudication that I am aware of. It has been sued in this court by a citizen of another state as a citizen of Oregon, and submitted without question to a trial of the case and a judgment against it accordingly.

It is a corporation created by an act of congress, with ability "to sue and be sued" in all the courts "within the United States," and is authorized and empowered to construct and operate a railway in this and other states of this Union. The capacity "to sue and be sued" does not of itself authorize the defendant to sue or be sued in any court, irrespective of the jurisdiction pertaining to the same. It only enables it to sue or be sued as a natural person might, in any court having otherwise jurisdiction of the controversy. *Manuf'rs Nat. Bank, etc.,* v. *Baack*, 8 Blatchf. 138.

But of what state, if any, the defendant is a citizen, is not so clear. In *Orange Nat. Bank* v. *Traver*, 7 Sawy. 210, [S. C. 7 FED. REP. 146,] this court was inclined to the opinion that a banking corporation formed under the national banking act of June 3, 1864, (13 St. 99,) to do business in Massachusetts, was a citizen of that state. And such was the conclusion reached by Mr. Justice BLATCHFORD in *Manuf'rs Nat. Bank, etc.,* v. *Baack, supra.* See *Main* v. *Second Nat. Bank, etc.,* 6 Biss. 26. But the defendant is organized to exist and do business in more states than one, without any declaration or provision indicating a particular domicile or principal place of business in any.

But in *Osborn* v. *Bank of U. S.* 9 Wheat. 816, it was held by the supreme court that a corporation created by an act of congress might be thereby authorized "to sue and be sued" generally in the circuit courts of the United States; and the power of congress to give such court jurisdiction of such a suit was sustained on the ground that any suit by or against such a corporation was necessarily a case arising under the laws of the United States, and therefore within the scope of its judicial power. And, since the decision in that case, congress, by the act of 1875, *supra*, has conferred upon the circuit courts jurisdiction in all cases arising under the law of the United States. The effect of this legislation, under the ruling in *Osborn* v. *Bank of U. S., supra*, is equivalent to a special clause in the charter of the Northern Pacific, authorizing it to sue and be sued in the circuit courts in all cases.

But the jurisdiction of the court, on the ground of the nature of the controversy, being clear, the question as to the authority of the defendant to construct the bridge, is next to be determined.

And, *first*, it is manifest that the defendant is authorized to construct and operate its road to Portland, either as a point on the main line to Puget sound or the northern extension of the branch thereto.

At the passage of the act of 1864, it is quite likely that congress knew but little about the relative situation of Portland, or whether the construction of the branch road to this point involved the crossing of the Wallamet river or not. But, as time passed, Portland grew in importance. The observation of the company, derived from those engaged in the survey and construction of the western end of its road, induced it to obtain from congress, in 1869, the authority to extend its branch from Portland, northward, to Puget sound, and in 1870 to construct its main line down the Columbia river valley, instead of across the Cascade mountains. This legislation was a practical admission by congress and the company of the mistake made in the original act, concerning the location of the main line of the road, and, in effect, gave the company the right to construct it to Portland, with an extension northward from there to the sound. To accomplish this, the river must be crossed at or near this point, either by a bridge or a ferry, and this must have been then known to congress. Under the authority to construct its road to Portland, the right of the company to cross the river by a ferry or a bridge, so high above the stream as in no way to interfere with its navigation, will be readily conceded. The power to construct and operate its road to and from Portland is given in express terms; and, undoubtedly, it may erect a bridge, as a part of said road, that does not interfere with the navigation of the river.

It is admitted that the act incorporating the defendant is a public grant, which is not to have effect beyond what is plainly expressed or clearly implied therein, or contrary to the manifest purpose of it. Any material doubt or ambiguity in its terms or provisions must be

resolved against it, and in favor of the public.    Nothing is to be taken as conceded but what is granted in plain terms, or by clear or necessary implication.    *Coolidge* v. *Williams,* 4 Mass. 144; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 544, 600; *Perine* v. *C. & D. Canal Co.* 9 How. 192; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 666; *Burns* v. *Multnomah Ry. Co.* 8 Sawy. 553; [S. C. 15 FED. REP. 177;] *Wells* v. *O. R. & N. Co.* 8 Sawy. 616; [S. C. 15 FED. REP. 561;] Cooley, Const. Lim. 394.

It is also a well-settled rule that a bridge which in any way or degree interferes with or obstructs the navigation of a navigable water, unless authorized by the proper public authority, is a public nuisance, and may be abated or the building thereof restrained at the suit of any private person who may suffer special damage therefrom. Ang. Water-courses, § 555; *The Wheeling Bridge Case,* 13 How. 564; *Hatch* v. *Wallamet Iron Bridge Co.* 7 Sawy. 127; [S. C. 6 FED. REP. 326, 780.]

As was said by this court in *Hatch* v. *Wallamet Iron Bridge Co., supra,* 132:

" The power to authorize the erection of a bridge over a navigable water of a state for the convenience of the inhabitants thereof, belongs to the state as a part of its general police power.  Congress does not possess this power directly, *eo nomine,* but its control over the navigable waters of the state, as a means of commerce, gives it a practical veto upon the power of the state in this respect. Therefore, no state can authorize or maintain the erection of a bridge over a navigable water, which, in effect, contravenes or conflicts with a law of congress concerning the navigation of the same.   And the fact that such water is wholly within the state is immaterial, if it is accessible from another state, or forms a part of a highway between itself and other states."

But this is not to be understood as denying the right of congress to bridge or authorize the bridging of navigable waters, under its constitutional power "to establish post-offices and post-roads," or make war or provide for the common defense.   *Wheeling Bridge Case,* 18 How. 431.

There is no express permission or authority in the charter of the Northern Pacific for bridging a navigable water on the line of its road, and the act of the state goes no further than to consent that the defendant may bridge the river if authorized thereto by congress.   It is said, and the fact is admitted, that it has already constructed a bridge, without question, across the Missouri river at Bismarck, under the authority of its charter.   But that is understood to be a high bridge, that in no way impairs the navigability of the stream.   On the other hand, it is claimed that the defendant impliedly admitted the want of authority, in this respect, in its charter, when it obtained from congress, on February 27, 1873, special permission to construct and maintain a draw-bridge across the St. Louis river between Rice's Point, in the state of Minnesota, and Connor's Point, in the state of Wisconsin.   17 St. 477.   But in reply it is said that this

bridge is not on the main line of the Northern Pacific, and was built by the company for some collateral purpose; and this appears probable from the provisions of the act, one of which is that any railway company may use the bridge under regulations to be prescribed by the secretary of war.

It is claimed by the defendant that section 5 of the act of 1864 contains authority to build the bridge. But while it does mention "draws" and "bridges" as things to be provided in the construction of the road, I think the primary purpose of this section is to lay upon the defendant a rule or standard of conduct in the construction and equipment of its road, rather than to confer upon it power to build draw-bridges over navigable waters. At the same time, it is not to be denied that the mention of "draws" and "bridges" as things "necessary," or that may be "necessary," in the construction of the defendant's road, and requiring them to be made "in a substantial and workmanlike manner," does imply, in some measure at least, that it was the intention of congress to authorize it to build "draw-bridges" on the line of its road whenever necessary to make it equal in that respect to railways of the first class. And it will not do to say that this provision is satisfied by the erection of substantial bridges across the non-navigable waters, ravines, and gulches on the line of its road, for in such bridges "draws" are not needed or used.

My impression is, and nothing has been shown or suggested to the contrary, that the term "draw," as used in this section, means a contrivance by which a section of a bridge across a navigable water is turned upwards or at right angles to itself, and parallel with the direction of the stream, so as to admit of the passage of vessels through the open space that could not otherwise pass the point. The definition in the lexicon is, "That part of a bridge which is made to be drawn up or aside." Worc. Dict. "Draw." If this exposition is correct, the term "draw," as used in the act, is redundant and without significance, unless the defendant is authorized to, and must if necessary, construct a low bridge across the navagable water, but so as to admit the passage of vessels through it.

What effect is to be given to the word "necessary" in this section, and who is to be the judge of what is "necessary" to the construction and equipment of the road in the manner therein contemplated, may also be a question. For the purpose of entitling the defendant to a patent for the lands, coterminous with the completed sections of the road, it is probably enough that it is constructed with such "draws, culverts, and bridges" as the commissioners appointed to examine the same, under section 4 of the act, may deem sufficient. But the judgment of these commissioners in this respect cannot have the effect to limit or restrain the right of the defendant to construct or provide additional or more costly and convenient draws and bridges, or other means of maintaining and operating its road as a first-class one. Whatever, in the judgment of the commissioners, is required to

bring the road up to the standard prescribed by section 5 of the act, is "necessary" to be done before the defendant is entitled to the land devoted by congress to its construction.    But in crossing a navigable water on the line of its road the company is not limited to the use of such means only as are absolutely necessary.    Within certain limits it may use those which it thinks most convenient.    A ferry may be all that is absolutely necessary for the transportation of passengers and freight, or even trains.    But the company may prefer, and the exigencies of its business may require, the more safe and expeditious, though costly, method of a bridge.    As has been said, the power to bridge this river is not given by the act to the defendant in express terms.    Neither is the power so given to cross it at all.    Therefore, unless it appears, by a clear and necessary implication from what is expressly provided, that it was the intention of congress to authorize it to cross the river by means of a draw-bridge, or at all, the attempt to do so is unlawful.

The power "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad" from Lake Superior to Portland, "with all the powers, privileges, and immunities necessary" to that end, is expressly conferred upon the company.

Portland cannot be reached from Lake Superior, or any point on the line between here and there, without crossing the Wallamet river. The right to cross it is, then, clearly implied in the express authority to construct a "continuous" line of railway from a point to the eastward of it to a town on its western bank.    Argument cannot make this proposition plainer than the mere statement of it.    The express power to construct the road cannot be exercised without the implied power of crossing the river in some way.    But by what means may this crossing be effected?    Only two methods are known or suggested—a ferry or a bridge.    The former may be sufficient to entitle the company to the land grant, but where the construction of a bridge is practicable, I think a ferry is considered an inferior method of prolonging a railway across a stream.    If the river was not navigable it would be absolutely necessary to bridge it.    And if, being navigable, the defendant is not authorized to do so, it must be, not from want of power to build a bridge, but from want of authority in so doing to obstruct or impair the navigability of the stream.

The allegations in the bill concerning the character and location of the bridge, and the degree of obstruction it may cause to navigation, are very general and indefinite.    The most that can be inferred from them is that the proposed bridge is not a high one, and therefore will, at least, be some obstruction to navigation.    During the past 17 years congress has authorized the construction of draw-bridges on railway lines across the Ohio, Missouri, and Mississippi rivers; and on June 23, 1874, (18 St. 281,) it authorized the Oregon & California Railway Company to bridge the Wallamet at this point, provided the draw should not be less than 300 feet.    See

*Hatch* v. *Wallamet Iron Bridge Co.* 7 Sawy. 138; [S. C. 6 FED. REP. 326, 780.]

In endeavoring to ascertain what was the intention of congress in this matter, account may be taken of its action in similar cases, and when it appears that it has commonly consented to the construction of draw-bridges for the use of railways over important navigable streams, the inference may be more safely and reasonably made that such was its intention in this case. The act of congress expressly provides for a first-class continuous road to Portland, to be constructed with all the necessary "draws" and "bridges." This, of itself, implies that the defendant may cross whatever waters are on the line of its road by the means usual in such cases, and particularly by those especially mentioned—draw-bridges. And when we see from the express action of congress in other similar cases that draw-bridges are commonly used with its consent, the implication is much strengthened that such was the intention in this case.

In *U. P. R. Co.* v. *Hall*, 91 U. S. 343, it was held that the bridge across the Missouri river between Omaha, in Nebraska, and Council Bluffs, in Iowa, is a part of the line of the Union Pacific Railway, and that the company was, therefore, authorized to construct it under section 14 of the act of July 1, 1862, (12 St. 489,) which simply provided for the construction of a line of railway by that company "from a point on the western boundary of the state of Iowa" to the 100th meridian west of Greenwich. The company claimed that the bridge was built under section 9 of the amendatory act of July 2, 1864, (13 St. 360,) which expressly authorized it to bridge the river, provided the same should "be constructed with suitable and proper draws for the passage of steam-boats," and should "be built, kept, and maintained at the expense of the company in such manner as not to impair the usefulness of said river for navigation to any greater extent than such structures of the most improved character necessarily do," and was, therefore, not a part of its road, and need not be operated as such.

In delivering the opinion of the court, Mr. Justice STRONG said:

"From that act [July 1, 1862] alone we have deduced the conclusion that the company was authorized and required to build their railway to the Iowa shore. That authority included within itself power to build a bridge over the Missouri. No express grant to bridge the river was needed. Whatever bridges were necessary on their line were as fully authorized as the line itself; and the company were as much empowered to build one across the Missouri as they were across the Platte, or any other river intersecting the line of their road."

The demurrer to the bill only raises the question of the authority of the defendant to build a draw-bridge at this point that will in some measure impair the navigability of the river. My deliberate conclusion is, though not reached without hesitation, that the act of congress authorized the construction of such a bridge. And this conclusion is directly supported by the authority of *U. P. R. Co.* v. *Hall*,

*supra.* For, although, as suggested by counsel for the plaintiff, the question in that case arose in a proceeding to compel the company to operate its road and bridge as a continuous line of railway for the benefit of the public, still the question of its power under an act similar to the charter of the Northern Pacific, to bridge a navigable water in the line of its road, was squarely presented to the court and unqualifiedly decided in the affirmative. See, also, *People* v. *R. & S. R. Co.* 15 Wend. 129.

But the plaintiff also maintains that admitting the defendant once had the right to bridge the river, it has lost it by the failure to keep the condition upon which the grant to it was made, namely, the completion of the road by July 4, 1878.

The argument is that the defendant, in the construction of this bridge and the appropriation of the space over the river therefor, is attempting to exercise the right of eminent domain after the practical expiration of its charter, and therefore without authority of law. But admitting this, the defendant is not attempting to take the plaintiff's property for any purpose; and the river way is a public easement which the defendant may be authorized by the legislature to cross with a bridge without condemnation or compensation. If the defendant, in the exercise of this privilege, negligently or unnecessarily injures or impairs the value of the private property of the plaintiff, he may have his action on that account for damages. *Transp. Co.* v. *Chicago,* 99 U. S. 639; *Pumpelly* v. *Green Bay Co.* 13 Wall. 174; Cooley, Const. Lim. 541.

And this is really the complaint of the plaintiff, that in consequence of the erection of this bridge his river property immediately above it will be impaired in value, and not that the defendant is attempting or intending to take or condemn his property to its use.

But waiving this question, it must be admitted that if the defendant has forfeited its right to further construct its road by reason of its failure to complete it within the time allotted, then it has no right to obstruct a public easement, as the navigation of this river, by the construction of a bridge thereover, and if it attempts to do so to the special injury of the plaintiff it may be restrained.

But the defendant did not lose its corporate existence by the failure to complete its road within the allotted time, either as to the whole of it or the part not so completed, and the numerous authorities cited in support of the affirmative of the proposition are not in point. It is not necessary to notice them all. Two of them (*In re B., W. & N. Ry. Co.* 72 N. Y. 248, and *Brooklyn S. T. Co.* v. *Brooklyn,* 78 N. Y. 527) are among the leading ones. In these it was held that a corporation organized under a special act to construct a railway, with a special provision that unless the road or some portion of it was completed within a specified time the corporate existence and powers should cease or be deemed at an end, could not exercise the right of eminent domain after a failure to comply with the act in respect to the time required.

But the case at bar is very different from these. The charter of the defendant in no way limits its existence to the time allotted for the completion of the road, or provides that any of its powers or privileges shall be forfeited or circumscribed in case it fails to complete it within that time. Section 8 of the act of 1864, upon which the plaintiff rests this branch of his argument, is simply a condition subsequent, to the effect that the corporation will complete the road by a certain time. Nothing is better established than that a failure to keep such a condition does not forfeit the corporate existence of privileges, and that no one can take advantage of it or complain of it except the government making the grant and imposing the condition. *Schulenberg* v. *Harriman*, 21 Wall. 62; *Southern Pac. R. Co.* v. *Orton*, 6 Sawy. 179; *Natoma W. & M. Co.* v. *Clarkin*, 14 Cal. 552; *Cowell* v. *Colorado Springs Co.* 100 U. S. 60.

And this doctrine is recognized and well stated, with its limitations, by EARL, J., in the very case cited by plaintiff from 78 N. Y. (p. 529.) The learned judge says:

"The general principle is not disputed that a corporation, by omitting to perform a duty imposed by its charter, or to comply with its provisions does not *ipso facto* lose its corporate character or cease to be a corporation, but simply exposes itself to the hazard of being deprived of its corporate character and franchises by the judgment of the court in an action instituted for that purpose by the attorney general in behalf of the people; but it cannot be denied that the legislature has the power to provide that a corporation may lose its corporate existence without the intervention of the courts by any omission of duty or violation of its charter. or default as to limitations imposed, and whether the legislature has intended so to provide in any case depends upon the construction of the language used."

But the conditions imposed upon the defendant by section 8 of the act is even modified by the provisions in section 9, from which it plainly appears that so far from congress intending that the powers of the corporation should cease or become forfeited in any particular by reason of its failure or inability to keep any of the conditions imposed by said section 8, expressly reserved to itself the right in case of such failure, for the period of one year, to "do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road."

In this way congress undertook to secure the completion of this great national work in any event, and so plainly declared in advance what might otherwise have been left to inference and argument from analogous cases, that it reserved to itself the right to deal with the defendant for any failure to comply with the conditions of the grant, and to excuse or enforce the same as it might, under all the circumstances, deem just to the defendant and best for the public good. Indeed, in view of the magnitude and hazard of the undertaking, it was expressly provided that even congress should not take advantage of a failure to perform any of the conditions for any period less than a year. And even the land set apart by congress to aid in the con-

struction of the road was not left liable to revert to the public domain, or be otherwise disposed of by congress for the failure of the company to construct or complete the work as required by the act; but, as was said in *U. S.* v. *Childers,* 8 Sawy. 174. [S. C. 12 FED. REP. 586,] it was *devoted* to the construction of the road in any event, and it is the duty of congress to see that it is so applied.    See, also, on this point, *Southern Pac. R. Co.* v. *Orton,* 6 Sawy. 178.    And this position is fortified by the fact that when congress intended that the corporate existence of the defendant should be forfeited or affected by its failure to keep a condition imposed upon it, it has expressly said so; as in section 19, where it is provided that unless $2,000,000 of the stock is subscribed, and 10 per centum paid thereon within two years from the passage of the act, "it shall be null and void."

The demurrer to the bill must be sustained, as the defendant has at least a right to build a draw-bridge across the river on the line of its road to Portland from the eastward or the sound.

But it is to be regretted that the legislative authority has not gone further and provided more particularly and definitely for the site and character of the proposed bridge.    As it is, these matters, within certain limits, must either be determined by the company or the courts, —by the former in the first instance, and the latter, ultimately.    For it is not to be presumed for a moment that congress or the state, in consenting to the erection of a draw-bridge at this point, intended to remit the whole matter to the judgment or convenience of the defendant, and permit it to thereby obstruct or impair the navigation of the river at its pleasure.    On the contrary, it will be presumed, until the contrary is declared, that congress intended, as provided in the act aforesaid, concerning the bridge at Omaha, that the defendant should locate and construct its bridge "in such manner as not to impair the usefulness of said river for navigation to any greater extent than such structures of the most approved character necessarily do."

A bridge across the river immediately in front of the city would be a serious obstruction to the usefulness of the river, as compared with one a mile or more above or below, and the latter even more so than the former.    So a wagon-road bridge, intended as an ordinary thoroughfare between the two sides of the river, and in which the draw is usually closed, would cause much more obstruction to navigation than a railway bridge, in which the draw is only occasionally closed. Until congress provides some specific directions in the matter the courts must determine, if the question is made, how far the defendant may impair the usefulness of the river in the construction and operation of the bridge.    In determining what is a reasonable use of the river, in this respect, reference may be had to the general legislation of congress, providing in detail what bridges railway companies may construct across navigable streams, and how far the convenience of the water travel and transportation may be impaired for

the benefit of that on land.    The bridge which congress has impliedly authorized the defendant to build across the Wallamet may be presumed to be equal in these respects to those which it has expressly provided for under similar circumstances.

As has been stated, the bill is indefinite as to the location of the bridge, and substantially silent as to its character.    But the general facts as to both are well understood in this community, and may even be taken notice of by the court.    A detailed description of the structure and location is given in the annual report of the secretary of the board of trade, published in the *Daily Oregonian* of September 25, 1883.

The location of the bridge is opposite Albina, and over a mile north of Stark-street ferry; the western end is 200 feet to the north of the intersection of Front and Sixteenth streets, and the eastern end 32 feet south of the end of the Northern Pacific Terminal Company's dock.    The length of the bridge between the end piers is 1,186 feet. It consists of three fixed spans of 264 feet each in length, and a draw span, which is the third from the western shore, of 394 feet in length. These spans are of iron and steel, with a double-track railway thereon, and rest on six stone piers.    The draw will be worked by steam, and when open will allow a clear channel for the passage of vessels of 174 feet in width on either side of the pier, with a depth of 25 feet therein at extreme low water.    The structure will be 11.6 feet in the clear above extreme high water, or about 38 feet above extreme low water.

In general, and particularly in the width and operation of the draw, this plan compares favorably with the bridges elsewhere allowed by congress, and is more favorable to the passage of vessels than the bridge authorized at this point by the act of June 23, 1874.

The demurrer is sustained and the bill dismissed.